Howard, Receiver, Appellant, *v.* Turner.

[Marked to be reported.]

*Contract—Fraud—Rescission.*

If a contract is induced by fraud of such a character as not to involve a crime, the contract may be rescinded at the election of the party defrauded.

In such a case the contract may be rescinded by the institution of proceedings to have the contract judicially set aside, or, if the other party is

the first to sue on the contract, the rescission, if not too late, may be set up as a defence. Where rescission is not declared in judicial proceedings, no further rule can be laid down than that there should be prompt repudiation and restitution as far as possible.

*Corporations—Stock subscription—Fraudulent prospectus.*

A contract to take and pay for stock in a corporation, entered into in consequence of a fraudulent prospectus, is voidable only and not void, and can only be avoided, subject to the rights of creditors, where there is a winding up order or a voluntary winding up. In such a case the intervening rights of creditors and the stockholders call for prompt action on the part of a subscriber who seeks to avoid his liability on the ground of fraud.

In an action on a promissory note given in payment of a subscription to the stock of a bank, alleged to have been obtained by fraud, the undisputed evidence was that prior to the failure of the bank and the institution of the suit, defendant took no steps to rescind or repudiate the contract of subscription or to surrender the certificate of stock which had been delivered to him, but on the contrary indicated his willingness to join with other stockholders in their efforts to reorganize the bank. *Held*, that he was liable for the amount of the note.

Argued Feb. 7, 1893. Appeal, No. 176, July T., 1892, by plaintiff, J. E. Howard, receiver of the Newton National Bank, from judgment of C. P. Chester Co., Aug. T., 1891, No. 51, on verdict for defendant, John H. Turner. Before PAXSON, C. J., STERRETT, McCOLLUM, MITCHELL and DEAN, JJ.

Assumpsit on promissory note given for subscription to stock of bank.

The facts as they appeared before WADDELL, P. J., are stated in the opinion of the Supreme Court.

Plaintiff's points were among others as follows:

" 2. The defendant cannot allege by way of defence to this suit that the subscription for stock in the bank, for which his note was given, was induced by fraudulent representations, even if such fraudulent representations were made and had induced the subscription, for the reason that since the said subscription was made, and before this suit was commenced, the bank has failed, and the rights of creditors and other innocent third parties have intervened. *Answer :* I cannot affirm that point in the language in which it is put. I would say to you that if the rights of creditors and innocent third parties have intervened since the note in suit was given and before the de-

fendant gave notice of his intention to rescind his contract, then he cannot resist the payment of the note on account of the alleged false representations." [3]

"3. The defendant was bound immediately, upon learning of the alleged fraud, to elect whether he would rescind the contract or waive the fraud, and his delay until after the commencement of this suit to make such election is fatal to his defence, by reason of laches. *Answer:* I must qualify that point also, gentlemen, and my answer would be as follows: ' The defendant was bound to elect, within a reasonable time after learning of the alleged fraud, to elect whether he would rescind the contract, or waive the fraud,' provided third party's interests had in the meantime intervened, but we cannot say ' his delay until after the commencement of this suit to make such election is fatal to his defence by reason of laches.' We do say, ' if he delayed electing until other rights intervened, such delay would prove fatal to his rescission.' " [4]

"4. The defendant having taken no steps to repudiate his contract of subscription, nor denied his liability until after suit was brought, but having expressed his willingness to join with his fellow shareholders in their efforts to reorganize the bank, and having thus induced them to take upon themselves the burden of such reorganization and the assumption of the old indebtedness, and new subscribers to the stock in the reorganized bank having come in, relying upon this note as an asset towards payment of such indebtedness, and the creditors having, in view of such reorganization, abated their claims, and contracted to accept the balance thereof by installments, the defendant is estopped from denying his liability on this note. *Answer:* We cannot affirm this point as drawn. We say to you, if the defendant took no steps to repudiate his contract, nor deny his liability, but, on the other hand, by his conduct or declarations, induced the stockholders of the bank to assume liabilities, or induced strangers to become stockholders in the bank, then he is estopped from denying his liability on the note." [5]

"6. Upon all the evidence in the cause the verdict should be for the plaintiff. *Answer:* We cannot say that to you, gentlemen. We must leave that as a fact for your determination. That would require us to say that the plaintiff, under all the

circumstances of the case, is entitled to recover.   We have felt that we were called upon to leave certain questions in the case for you to determine, and as you will determine them you will determine whether the plaintiff or defendant is entitled to the verdict.   I must, therefore, refuse this point." [6]

Defendant's points were, among others, as follows:

" 7. If the jury find that Charles R. McLain was in fact the agent of the Newton National Bank, and by false and fraudulent statements induced the defendant to sign the note in suit, or the note of which the note in suit was a renewal, the plaintiff cannot recover in this action.   *Answer:* As you will see, this is a statement of the principles of law as I have already given them to you in my charge in chief, and I therefore affirm that point." [7]

" 8. If the jury find that C. R. McLain was the agent of said Newton National Bank to sell its increase of capital stock, and shall find further that he represented to the defendant that said bank was in a sound and solvent condition, and that all its loans and discounts were good and the paper it held was first-class commercial paper, and shall find further that the defendant relied upon said representations when he agreed to take the stock of said bank for his wife, and shall find further that the said bank was at the time said representations were made not sound and solvent, and that all its loans and discounts were not good or on first class commercial paper, and said C. R. McLain knew that the said statements were false when he made them, the bank cannot recover in this suit.   *Answer:* I affirm that point, with the addition of what I have already said in my general charge, unless the defendant has waived that right by what may have transpired since he discovered the falsity of these representations." [8]

Verdict and judgment for defendant.   Plaintiff appealed.

*Errors assigned* were (3–8) instructions, quoting them.

*Thomas B. Taylor, Thomas W. Pierce* with him, for appellant. —The fraud in obtaining the subscription would render the contract voidable but not void.   After the rights of others had accrued, as those of creditors, upon the insolvency, the right to rescind the contract of subscription was gone, and the remedy

of defendant would be against the person who had defrauded him.

The reorganizers have the same rights as the receiver, into whose shoes they have stepped.   The receiver does not represent the corporation merely, but is adopted for the benefit of all parties who may establish rights in the case : Booth v. Clark, 17 How. 331.

If a corporation is insolvent, a shareholder, whose contract of subscription was obtained by fraud of the company's agents, cannot diminish the security of bona fide creditors by rescinding his contract to contribute the amount of capital subscribed by him : Morawetz, Corp. 839; Oakes v. Turquand, L. R. 2 H. L. 325; Stone v. Bank, L. R. 3 C. P. Div. 307; McNeill's Case, L. R. 10 Eq. 503; Henderson v. Royal British Bank, 7 E. & B. 356 ; Wright's Case, L. R. 12 Eq. 349 ; Upton v. Englehart, 3 Dillon, 496 ; Upton v. Tribilcock, 91 U. S. 55 ; Webster v. Upton, 91 U. S. 65 ; Sanger v. Upton, 91 U. S. 56 ; Ogilvie v. Knox Ins. Co., 22 How. 380 ; Chubb v. Upton, 95 U. S. 665 ; Saffold v. Barnes, 39 Miss. 400 ; Ruggles v. Brock, 6 Hun, 164 ; Michener v. Payson, Assignee of the Republic Ins. Co., 13 Nat. Bank Reg. 49 ; Litchfield Bank v. Church, 29 Conn. 137 ; Dettra, Receiver, v. Kestner, 147 Pa. 566.

It is clear that no effort to have Mrs. Turner relieved from her liability as a stockholder was made prior to the insolvency of the bank.   If plaintiff's contention is not correct, that that fact took away from her the right to relief as such stockholder, then it is urged that there was no evidence in the case showing any movement on either her or her husband's part to rescind the contract for these shares.

A party who would otherwise be entitled to set aside a contract on the ground of fraud cannot do so, if, after discovering the fraud, he has acted in a manner inconsistent with the repudiation of the contract: Briggs's Case, L. R. 1 Eq. 483 ; Scholey v. Central Ry., L. R. 9 Eq. 266 ; Ashley's Case, L. R. 9 Eq. 263 ; London & Staffordshire Fire Ins. Co., 24 Ch. Div. 149 ; Bank of Macon v. Bartlett, 71 Ga. 807 ; Ogilvie v. Knox Ins. Co., 22 How. 387.

Before a rescission can be had, equity requires that the shares should be returned : Pearsoll v. Chapin, 44 Pa. 9; Beetem's

Admrs. v. Burkholder, 69 Pa. 249; Francis v. R. R., 108 N. Y. 93; Gates v. Bliss, 43 Vt. 299.

*Alfred P. Reid, R. E. Monaghan* and *George B. Johnson* with him, for appellee.—The Newton National Bank was the real plaintiff in this suit, and was liable for the fraud of its agent in procuring the subscription to its increase of capital.

Whether the defendant had waived the fraud or not was a question of fact for the jury to determine, and it was so submitted.

There was no evidence that Turner took any step there which would waive his right. He never united with the other stockholders in the reorganization scheme. All the correspondence subsequent to this date was with Mr. Ives personally, who eventually furnished the money required to complete the reorganization upon the expectation that Mrs. Turner would pay the assessment. In all this there was nothing that could be construed into a waiver of the right to set up this defence as against the bank. When this suit was brought the shares of Mrs. Turner were forfeited and liable to sale at auction, and Mr. Ives took the shares she might have had a title to, and her certificate was of no value and there was no occasion to offer to return it.

OPINION BY MR. CHIEF JUSTICE STERRETT, May 22, 1893:

This suit is on a note admitted to have been made and delivered by defendant to the Newton National Bank in part renewal of his note for $990 at ninety days from August 9, 1890, with interest, etc. The consideration of this last mentioned note was nine shares of the increased capital stock of said bank taken by defendant in the name of his wife, Louisa E. Turner, under the following circumstances: In April, 1890, the bank—located and doing business at Newton, Kansas,—decided to increase its capital from $100,000 to $200,000, and for that purpose authorized its cashier, C. R. McLain, to solicit subscriptions for said stock. In July following Mr. McLain came to Chester county, and, upon the faith of his representations, defendant, as the latter alleges, verbally agreed to take, in his wife's name, nine shares of said new stock at $110 per share, for which he gave said note of August 9, 1890. The

transaction was to have been cash, but on August 5th defendant wrote that he had been disappointed in receipt of money, and suggested that, if satisfactory to the bank, he would make a note for the amount at ninety days with interest, and the certificate of stock might be held as collateral security. This proposition having been accepted, the note was forwarded and certificate of stock, No. 302, issued to Mrs. Turner, was deposited with her neighbor, Truman C. Moore, to be held for the bank as collateral security, etc. A certificate to that effect was given to Mrs. Turner.

In September following, the comptroller of the currency certified that said increased capital had been paid in, thus making the capital of the bank two hundred thousand dollars. On November 9th the note in suit was given for balance of the original note. On the 20th of same month the bank failed, and a few days thereafter the plaintiff, J. E. Howard, was appointed receiver. At that time, the bank's condition, as shown by schedules filed with the comptroller of the currency, was:

" Total estimated assets, .     .     .     . $284,810.58
     Total liabilities, not including capital,     270,272.57
                                             ——————
          Apparent excess of assets,     .     $14,538.01 "

In January, 1891, a meeting of the stockholders was held at Newton, Kansas, for the purpose of ascertaining the amount, condition and character of the assets and liabilities of the bank, etc., and statement thereof was prepared by the secretary of the meeting. Pursuant to resolution then adopted, and with the view of reorganizing the bank, meetings were held in Philadelphia on the 16th and 17th of April, 1891, and resulted in a resolution to reorganize by a voluntary assessment of $50.00 on each share of stock, and appointment of a stockholder's committee, of which Mr. F. T. Ives was chairman, to confer with the comptroller of the currency, and arrange details of reorganization. At a subsequent meeting held at Newton, May 20, 1891, it was further resolved to reduce the capital from $200,000 to $100,000, and on May 22d the prior proceedings of the stockholders were ratified, and the officers were authorized to issue new certificates of stock,—one share for every two shares of old stock,—to those who paid the $50.00 per share assessment on the old stock, and all stock on which said assessment was not

paid by June 1, 1891, should be sold at public vendue on twelve days notice.   The bank, through said committee, had arranged with all its creditors, who were not paid in cash, to pay their respective claims in four equal installments, commencing September 1, 1891.   All these preliminaries having been satisfactorily arranged, the receiver, on June 29, 1891, turned over to the reorganized bank all the assets, and thereupon business was resumed.

The defendant was present on first day of meeting in Philadelphia, but not on the following day when the reorganization scheme was adopted by the stockholders.   Both he and his wife, however, corresponded on the subject with Mr. Ives, chairman of reorganization committee.   Under date June 4, 1891, Mrs. Turner wrote: "I want or expect to pay my assessment of 50 per cent towards reorganizing the bank.   But do not wish to send the amount until I know positively that you are going to reorganize," etc.   Five days thereafter defendant wrote: "Mrs. L. E. Turner has nine shares of Newton National Bank Stock. Should the bank be reorganized she will likely pay the assessment of fifty per cent.   But, as she will have to borrow the money to do so, does not want to do that, unless it is a sure go. Kindly let me know how the bank stands at this time."   Mr. Ives replied to both of these communications.   To the latter he says, under date of June 17th: "The letter received here from Mrs. L. E. Turner was answered, informing her that the subscriptions were all in for the $100,000, but hers and two others.   One of the others is already remitted and the other is expected daily.   In order to facilitate opening the bank and relieve suspense of stockholders I put in the difference required, expecting it returned to me soon enough not to afford much inconvenience."   Replying to the letter addressed to herself, Mrs. Turner, under date June 29th, says: "On or about the day I received your letter, some two or three weeks ago, Mr. Howard, receiver for the Newton National Bank, brought suit against Mr. Turner and blocked matters for the present."

In answer to notice sent by the receiver in January, 1891, defendant, referring to the note in suit, says under date January 19th: "This note was given by me for stock for Louisa E. Turner. . . . I will not be able to meet the note in full. . . . Now I am willing, if you can receive a new note when due,

paying part of it, and will pay balance in full 60 to 90 days from that time."

It also appears that in November, 1890, after the bank failed, Mr. Moore, the custodian of the certificate, offered it to the defendant; and the latter, in answer to the question whether he received it or not, testified: " It was left lying on the table; I suppose I accepted it."

The foregoing are the salient facts, as to the origin, consideration, etc., of the note in suit, leading up to the defence that was successfully interposed in the court below, viz.: that the agreement to take the stock, giving the original note in payment thereof, etc., was induced by the fraudulent misrepresentations of the cashier as agent of the bank in procuring subscriptions, etc.

Without referring to the alleged misrepresentations, but assuming, for argument's sake merely, that they were such as would have justified the defendant in rescinding the contract before the bank became insolvent or other rights attached, the controlling question, under all the evidence, is whether that defence was available at the time it was interposed.

As a general rule, it is well settled that a contract induced by fraud is not void, but voidable only at the option of the party defrauded. In other words, it is valid until rescinded, and it is for the defrauded party to elect whether he will be bound; but, if he affirm the contract, he must affirm it in all its terms. Pollock, Contracts, *536; Pearsoll v. Chapin, 44 Pa. 9. When, however, the fraud is of such a character as to involve a crime, ratification thereof is contrary to public policy and cannot be permitted; but, where the transaction is merely contrary to good faith and fair dealing,—where it affects individual interests only—either ratification or rescission, at the election of the party defrauded, is permissible: Shisler v. Vandike, 92 Pa. 447; Babcock v. Case, 61 Pa. 431; Leaming v. Wise, 73 Pa. 173. In the last case it is said if defendants were guilty of the alleged fraud, the plaintiffs, on discovering it, had an undoubted right to rescind the contract, and upon a tender of the stocks to demand back the price paid for them, but it was their duty to do so within a reasonable time. Omission to repudiate within a reasonable time is evidence, and may be conclusive evidence of an election to affirm the contract. Elec-

tion to rescind must be communicated to the other party. One way of doing that is to institute proceedings to have the contract judicially set aside; or, if the other party is the first to sue on the contract, the rescission, if not too late, may be set up as a defence. Where rescission is not declared in judicial proceedings, no further rule can be laid down than that there should be "prompt repudiation and restitution as far as possible."

A contract, to take and pay for stock in a corporation, made, in consequence of a fraudulent prospectus is voidable only and not void, and can only be avoided subject to the rights of creditors, where there is a winding up order or a voluntary winding up: Bispham's Equity, § 472; 2 Addison, Cont., 8th ed. 774; Cook on Stock, etc. §§ 151 to 154. The intervening rights of creditors and other stockholders call for prompt action on the part of a subscriber who seeks to avoid his liability on the ground of fraud: Bispham's Equity, sec. 154.

In view of these principles, and the uncontradicted facts above referred to, it is impossible to see any ground on which a valid defence in this case could be based. The undisputed evidence is that prior to the failure of the bank and institution of this suit by the receiver, neither the defendant nor his wife took any steps to rescind or repudiate the contract of subscription or to surrender the certificate of stock, as to which he testified, "It was left on the table; I suppose I accepted it;" nor did he deny his liability on the note. On the contrary, up to the time suit was brought, they both indicated a willingness to join with other shareholders in their efforts to reorganize the bank. Mrs. Turner, as we have seen, wrote to the chairman of the reorganization committee: "I want or expect to pay my 50 per cent towards reorganizing the bank; but do not wish to send the amount until I know positively that you are going to reorganize," etc. A few days thereafter defendant wrote to the same effect, saying his wife would likely pay the assessment "should the bank be reorganized," but she did not want to borrow the money for that purpose "unless it is a sure go." At that time, as the chairman wrote them in reply, the whole amount of the assessment, $100,000, except Mrs. Turner's and two others, was in, and one of those was on the way. Reorganization was then practically an accomplished fact. Everything, including the conduct of defendant and his wife, pointed

to that conclusion; and doubtless the remittance would have been made if the receiver had not brought suit in the meantime. That, as Mrs. Turner wrote, " blocked matters for the present." In nothing that was said or done, from the beginning up to that time, was there anything that could be tortured into election to rescind on the part of the defendant.   At that time, or rather prior thereto, the rights of the bank's creditors, to the extent of its assets, including the additional capital stock represented in part by defendant's note, had attached; the stockholders, with the exception of Mrs. Turner and one or two others, relying on obtaining possession of all the assets, had contributed nearly $100,000 for the purpose of reorganizing the bank, which of course included settlement and payment of all its liabilities.   These facts were established by uncontroverted evidence.   There was no testimony from which any jury could, or ought to be permitted to find a state of facts more favorable to the defendant.

Plaintiff's second, third, fourth and sixth points for charge are substantially predicated of the foregoing undisputed facts, and should have been, respectively, affirmed without qualification and the jury instructed, as requested in the sixth, that " upon all the evidence in the cause the verdict should be for the plaintiff."

It follows from what has been said that there was error also in the learned judge's answers to defendant's seventh and eighth points respectively.   The 3d to 8th specifications of error inclusive are therefore sustained.

Judgment reversed and a venire facias de novo awarded.