# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

W. H. R. Hilliard and Delia R. Carr, Appellants, *v.* The Allegheny Geometrical Wood Carving Company, a Corporation, etc., Dr. C. L. Goehring, H. A. Spangler, Louis Marchand, William Trohe, F. D. Eschelman, W. H. Graham and F. C. Kirschler.

*Corporation—Stockholder—Fraud—Laches.*

A stockholder who is the secretary of a corporation and who, through possession of the minute book, and from other sources, has full and complete knowledge of the organization of the company, and the details of its business, cannot, after the delay of a year and a half, and after the company has become insolvent, set up as a ground for a claim against the officers of the company who sold him his stock, that he was induced to buy it by false and fraudulent misrepresentations upon their part, and that the company had been fraudulently organized, inasmuch as the ten per cent in cash required by the act had not in reality been paid in.

Argued Oct. 30, 1895. Appeal, No. 150, Oct. T., 1895, by plaintiffs from decree of C. P. No. 3, Allegheny Co., February Term, 1892, No. 589, dismissing bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for a receiver and to compel certain of the defendants to repay to complainants moneys which were alleged

to have been paid for stock upon the faith of representations made by defendants.

The case was referred to Thomas Patterson, Esq., who found the facts to be as follows :

The Allegheny Geometrical Wood Carving Company was incorporated on January 28, 1889, with a capital stock of $200,000 in 4000 shares of $50.00 each.   Dr. Goehring was a subscriber for 3955 shares, and the balance was taken by the other defendants in small amounts as set forth in the bill.   The purpose of the corporation was the manufacture of wood mouldings upon machines for which Dr. Goehring held patents.   No mention was made in the original application of any transfer of the patents, or rights under the patents, to the corporation in payment of Dr. Goehring's subscription, and the result was that Dr. Goehring stood bound to take 3955 shares at $50.00 each on a cash basis.

This result being discovered, on February 4, 1889, an application was made for an amendment to the charter, which amendment was allowed on February 27, 1889.   By the terms of this amendment Dr. Goehring subscribed for 2400 shares instead of 3955, and these were fully paid, 400 being paid in cash, and 2000 by a transfer to the corporation of the exclusive right to manufacture and sell the machines and products of machines under Dr. Goehring's letters patent, within the territory described, being roughly, the western part of Pennsylvania and five counties in Ohio.

On November 13, 1889, Dr. Goehring surrendered to the company this 2000 shares of full-paid stock, and gave to the company the right to operate the machine they then had and six additional machines, in the territory mentioned in the amendment to the charter, upon payment by them of a royalty of 50 cents per thousand on manufactured lumber.

On the same day a lease and license was executed by Dr. Goehring as president of the company, with himself as owner of the patents.   There was some dispute as to whether or not this complied with the terms of the agreement made with the stockholders.   There does not appear to be any material difference, though of course, if there were, the agreement between Dr. Goehring and the stockholders would control.

On November 16, 1889, Mr. Hilliard, after a conversation

with Dr. Goehring and Mr. Spangler, the terms of which will be considered hereafter, made his first purchase of 200 shares of treasury stock at $25.00 per share; on February 1, 1890, he purchased 400 shares at $25.00 per share; on February 15, 1890, he purchased from Dr. Goehring 30 shares of his paid-up stock at $40.00 per share, and on March 10, 1889, he purchased for his mother, Mrs. Carr, the other plaintiff, 400 shares of treasury stock at $25.00 per share. These purchases gave plaintiffs a control of the stock.

On Nov. 20, 1889, at a meeting of the board of directors, F. D. Eschelman resigned as a director of the company and Mr. Hilliard was elected to fill his place, and Mr. Marchand resigned as secretary, Mr. Hilliard being chosen as secretary in his place. These changes were confirmed at the next meeting of stockholders, January 15, 1890. Mr. Hilliard continued to act as secretary of the company until it went into the hands of a receiver; the last minutes signed by him are December 12, 1891.

The questions of fact which should be specially found appear to be as follows:

First. It is charged that the ten per cent was not in fact paid to the treasurer when the application was made. The evidence on this point seems to establish the following circumstances:

On January 3, 1889, some days before the charter was granted, Dr. Goehring made a demand note for the sum of $20,000, payable at the Third National Bank of Allegheny, to the order of his father, Jacob Goehring, his brother-in-law, Louis Marchand, his sister Ida M. Goehring and William Trohe, who was a machinist in his employ. Marchand and Trohe were to be directors in the new company. This note was discounted at the bank, where payable, and the proceeds placed to the credit of Dr. Goehring. There were some other moneys to his credit at that bank, but just how much does not appear. This amount he then checked over to Mr. Spangler, the treasurer of the company, and who was also cashier of the Third National Bank. The testimony shows pretty conclusively that this note was discounted upon its own merits.

These witnesses also deny that there was any arrangement that the note was to be repaid by the company. There being no contradiction of this testimony, and the answer being responsive on this point, the fact must be determined in accordance with the testimony referred to.

The money being placed to Dr. Goehring's credit it seems to the master that it is not important whether he raised it by his own note or in some other way, so long as there is no evidence of a prearranged plan to substitute a paper credit for an actual payment of cash. The master accordingly finds:

1st. That the ten per cent of the capital stock, viz: $20,000, was paid in cash, in good faith, prior to the certificate of that fact by the treasurer, in the application for a charter.

Second. The next question is closely connected with the foregoing, and that is whether or not this money was paid back to Dr. Goehring in pursuance of an arrangement, which amounted to a conspiracy, that he should sell to the company a leasehold he owned on Boquet street, together with a wood carving machine and the right to use same free of royalty, and certain machinery on the leasehold for the sum of $20,000.

It may be remarked that the only evidence from which the master is asked to infer this fact is the identity in amount between the payment made by Dr. Goehring to the company, and the amount paid back to him by the company for the leasehold and machinery. It seems to the master that this inference is not sufficient to overcome the positive testimony of the witnesses upon the subject. The check for the $20,000 was given to Dr. Goehring on February 4, 1889. At a meeting of the board of directors on that day it appears that the proposition of sale was made by Mr. Eschelman, on behalf of Dr. Goehring, and after some discussion accepted. The charge that there was any prearrangement or that the sale was any other than a bona fide sale of the property mentioned is denied by Mr. Marchand, Dr. Goehring and Mr. Spangler. A great deal of testimony was taken as to the intrinsic value of the leasehold and machinery. It is unnecessary in the view the master takes of it to consider it in detail. The plaintiffs offer proof that the leasehold, being subject to a rent of $2,500 per annum, was worth nothing; that the wood carving machine was worth perhaps $4,500, and the other items perhaps $1,000 more. The defendants on the other hand claim that the leasehold could be sublet for its full rental and still leave room for the company's operations, and that the machine free of royalty was worth $8,000 or $9,000 in addition to its value as a machine. It is impossible to reach any conclusion, in view of the conflicting testimony

as to just what the actual market values were.  The leasehold, in view of the evidence as to subletting, would perhaps be worth a bonus, and in the position the company was at that time the machine free of royalty was worth a good deal more than its mere cost of construction.  There appears to have been enough room for an honest belief in the price asked by Dr. Goehring to make the action of the board of directors free from fraud on the ground of gross inadequacy of price.  The master accordingly finds:

2d.  That the purchase from Dr. Goehring of his leasehold on Grant and Boquet streets, his wood carving and the other items set forth in the bill of sale for $20,000, was fairly made, and without any prearrangement or conspiracy by which the articles should be purchased for a sum which should reimburse Dr. Goehring for his contribution of $20,000 to the capital stock.

Third.  Turning now to Mr. Hilliard's first purchase of stock and his interviews with Dr. Goehring and Mr. Spangler, which led up to it.  It seems that Mr. Hilliard first met Dr. Goehring at the Pan-American Exposition in November, 1889.  He was much interested in the samples of wood which Dr. Goehring had there, and entered into a conversation with him.  As a result of this conversation he went within a short time thereafter, in company with Dr. Goehring, to see the machine in actual operation.  Dr. Goehring told him in substance that a company had been formed to operate the machines, and that he could have some of the stock.  In reply to a question as to the financial standing of the concern Dr. Goehring referred him to Mr. Spangler, the treasurer.  Dr. Goehring appears to have praised the machine highly, spoken enthusiastically of the possibilities of the new company, and said that all it needed was some one who could push it.  The material representation which is relied upon by plaintiff is not denied by Dr. Goehring.  On page 18 he was asked by Mr. Carpenter:

"Did you not in your conversation with Mr. Hilliard, and as an inducement to him to purchase stock in your corporation, represent that the machine which you had invented and that was in use by the company was a perfect and complete machine?  A. Yes, sir; and it is to-day, excepting that it has been dismantled."

He also admits in his answer, par. 5: "It is also admitted

that the said C. L. Goehring did assure the said Hilliard that his patent appliances would do the work for which they were designed, and it is now averred by the said defendants that the said patent appliances have proven themselves capable in every respect of doing the work for which they were designed."

It is to be observed, however, in this connection, that the machine which Dr. Goehring then had completed had never been used for anything more than running off samples, and was admittedly not perfect as a machine. The representations alluded to appear to have been directed towards the second machine which the company had already purchased, and which was to be completed at the works of Graham & Co., Rochester. This appears from the testimony of Mr. Hilliard. " Q. Were there any statements made to you by Dr. Goehring as to the completeness of the wood-carving machine which he had in the place of business of the company? A. He stated that the machine which he had there then was the first machine, and was therefore more or less crude, but that the machine which was coming, which had been purchased by the company, prior to my purchase of stocks had all these crude things eliminated from it. Q. At the time you made this further purchase of stock in February, 1890, were you thoroughly satisfied with the conditions and prospects of the company? A. I relied entirely on what I was told by Mr. Spangler and Dr. Goehring, for this reason, that the old machine was confessedly defective ; the new machine on which we proposed to base our business did not arrive until March 22d."

From this it appears that the representations of Dr. Goehring were his expression of belief, doubtless very confidently advanced, as to the perfection and completeness of the machine under process of manufacture at Rochester.

The master therefore finds :

3d. That prior to the first purchase of stock by Mr. Hilliard, Dr. Goehring represented to him that his machine was perfect and complete, and that his patent appliances would do the work for which they were designed. At the time these representations were made the machine then finished and in the possession of the company was stated by Dr. Goehring to be imperfect in certain respects. These imperfections were to be removed in the machine then in process of manufacture.

4th. In regard to the truth or falsity of these representations, there has been a great deal of evidence taken.   The defendants have offered testimony including several employees who have worked at these machines that they were perfect and complete, doing the work for which they were designed without trouble. They have also called a number of experts in wood working machinery, who have testified to the same effect.   The plaintiff on the other hand has testified to repeated difficulties with the machine, and has been corroborated by witnesses who were employed in working it.   The testimony is so voluminous that it would extend greatly the limits of the report to go over it in detail.   The master is of the opinion that there were defects in the machine which interfered to some extent with its success-ful operation.   In reaching this conclusion the master bases his finding largely on the testimony of Mr. Hilliard.   This testimony throughout is marked with a spirit of candor and an evident disposition to state simply the facts.   His position for judging of the actual operation of these machines seems to have been much better than that of Dr. Goehring, who was absent much of the time and who was interested in other companies and in the sale of patent rights elsewhere.   The defects do not seem to have been insurmountable, as Mr. Force, superintendent of the mill, a witness for plaintiff, testifies it was due largely to the high rate of speed at which the machines were run under Dr. Goehring's directions.   The bearings it seems would become heated and the machine have to be stopped.   The company it seems purchased these machines at intervals.   The first on November 4, 1889; the second was delivered on March 22, 1890, and the third was ordered in June of the same year.   The same defects seem to have marked them all.

The master accordingly finds:

4th. That the machines sold by Dr. Goehring to the company were not complete and perfect, but were subject to certain defects, which, it seems, could have been relieved, at least to some extent, by a different method of operating or running them.

Fifth. In regard to the representations of Mr. Spangler, the treasurer of the company, to Mr. Hilliard at the time of purchase there appears to be no material dispute.   Mr. Hilliard, at page 106, says: " Mr. Spangler said there was no indebtedness

except what appeared on the pay roll, incidental expenses, running expenses." This does not seem to be disputed; Spangler, page 207, answer, par. 5. It should also be stated that Mr. Hilliard asked but few questions in regard to matters. His full account of the investigation he made before purchasing will be found on page 105 and seq.

The master therefore finds :

5th. That prior to his purchase of stock Mr. Hilliard inquired of Mr. Spangler, the treasurer of the company, and was informed that there was no indebtedness except the pay roll and incidental and running expenses.

Sixth. It is not disputed that at this time the indebtedness of the company amounted to $3,600 (Hilliard, page 104), of which $2,000 was in the form of a note discounted at the Third National Bank of Allegheny, and the balance consisted of a number of accounts for many of which bills had not yet been rendered. The master accordingly finds the facts as thus stated.

Seventh. The subsequent conduct of the parties, so far as the defendants are concerned, is not of much consequence, for the fraud, if one was perpetrated, must have been complete at the time the stock was purchased.

It is averred, and not denied, that Dr. Goehring interfered to some extent with sales of the company's products, outside of the territory, by representing to parties in the trade that the company's prices were too high. He seems to have been led to this action by anger at the agents of the company in interfering with his sale of machines, a fact which they admitted freely on the stand, and to have demanded their recall, and afterwards to have assumed an attitude of hostility to the company, where he met its agents outside of the territory which had been designated as their field of operations in the amended charter and the lease and license. The master accordingly finds the facts as stated in this paragraph.

Eighth. The conduct of Mr. Hilliard, however, after his purchase of stock, is the most important feature of the case, in the master's opinion, and needs a somewhat extended review.

As stated above, Mr. Hilliard was elected secretary of the company on November 20, 1889. The minutes of that meeting are signed by him as secretary. At that meeting the minutes of the stockholders' meeting of November 4, 1889, at

which the agreement was entered into with Dr. Goehring for a surrender of 2000 shares of his stock and the operation of the company thereafter on a royalty of 50 cents per thousand feet within the territory mentioned in the amended charter, were read and approved. Also the minutes of the special directors' meeting of November 13, 1889, at which the formal agreement and license carrying into effect the agreement of the stockholders' meeting, were read and approved. From this time on the minute book was in Mr. Hilliard's possession and all the minutes are signed by him. This minute book set forth in full the charter, amended charter and the terms of the sale of the leasehold and machine by Dr. Goehring to the company. (Minute Book, page 5.)

Mr. Hilliard received all the books of the company at the time they rented offices in the Penn Building some time in February or March, 1890. At this time he first actually discovered the circumstances as to the payment of the ten per cent, the purchase of the property for $20,000, and the existence of the $2,000 note which the company gave prior to his purchase of stock. He did not complain to any one except Mr. Spangler. He continued in active management and control of the operations of the company down until the time it went into the hands of a receiver.

The minutes of January 17, 1890, show the following:

" The necessity for raising money to carry on the increased business of the company was discussed, and it was resolved to place on sale 500 shares of the treasury stock of this company on a basis of half the par value per share ($25.00) paid in at once. The secretary was instructed to place 200 shares of said stock in the hands of a responsible broker, and to offer him one per cent commission for the sale of the same."

The minutes of the next directors' meeting, February 11, 1891, show the following:

" The secretary reported that he had had an interview with a broker in regard to the practicability of placing a part of the company's stock on the market, and it was the opinion of the broker that the company's stock could not be marketed at the present time to advantage except through the medium of private sales.

" In accordance with the above report, and the urgent needs

of the company, it was formally moved and unanimously voted to levy an assessment, payable on or before February 28, 1891, of five dollars per share on stock not full paid."

From these considerations the master finds:

8th. That Mr. Hilliard after his several purchases of stock on his own behalf, and the behalf of his mother, the coplaintiff, and after knowledge of the facts concerning the payment of the $20,000, for the leasehold and machinery, and the outstanding note of the company for $2,000, and after having at hand in the minute book of the company in his possession full means of information as to the facts concerning the organization and reorganization of the company, continued to act as manager of the company, and with the other directors in furtherance of its projects and in affirmance of his ownership of the stock, from March, 1890, down to the filing of this bill in January, 1892.

The master found as a conclusion of law that there was no fraud in the organization of the company, and that there was no fraudulent misrepresentation made by Dr. Goehring, and that complainant, Hilliard, had been guilty of laches in delaying his action, and by his delay had virtually affirmed the contract. The master accordingly recommended that the bill should be dismissed.

Exceptions to the master's report were overruled by the court, and a decree entered dismissing the bill.

*Error assigned* was above decree.

*J. McF. Carpenter, D. T. Watson* with him, for appellants.— Direct proof of fraud is not necessary. There can be no mistake as to the facts connected with the whole transaction, and it cannot be successfully denied that Mr. Hilliard and his mother were both grossly deceived and defrauded.

Hilliard was not guilty of laches: 1 Morawetz Private Corporations, 2d ed.; 1 Bigelow on Frauds, 30; Watterman v. Sprague Mfg. Co., 12 Atl. 245; Kirby v. Lake Shore etc. Co., 120 U. S. 130; Amy v. Watertown, 130 U. S. 320; Michoud v. Girod, 4 How. 503; Gibbs v. Guild, 9 Q. B. Div. 59.

*W. P. Potter, Wm. A. Stone* and *A. H. Clarke* with him, for appellee.—Fraud is never to be presumed, and the burden of

proving it rests upon him who alleges it. It is a question of fact to be determined from the circumstances in the case: Hagen v. Thompson, 1 Black, 91; Humes v. Scruggs, 94 U. S. 22; 2 Parsons on Con., 784.

Allegations of fraud must be specific in time, place, persons, etc., so that the defendant may meet the charge and the court see whether ordinary diligence to discover the fraud has been used: Stearns v. Page, 7 How. 819; Moore v. Green, 19 How. 69; Badger v. Badger, 2 Wall, 87; Amble v. Choteau, 107 U. S. 580; Young v. Edwards, 72 Pa. 257; Densmore Oil Co. v. Densmore, 64 Pa. 43.

PER CURIAM, January 6, 1896:

The facts of this case, as they were correctly found by the learned master from an impartial review of all the testimony, as well as his conclusions of law, are fully set forth in his clear and satisfactory report approved by the court below, and need not be repeated here.

His findings of fact, as to the plaintiffs' laches and acts of ratification, and the legal conclusions properly drawn therefrom, completely eliminate from the case all questions of fraud or misrepresentation. He correctly held that it was the duty of the plaintiffs, after they had knowledge of the alleged fraudulent acts and misrepresentations, to promptly rescind or offer to rescind the contract; that they could not await the outcome of the business and, after it proved unfavorable, avail themselves of the alleged fraud. He also specifically held that the mere delay, for over a year and a half after the plaintiff Hilliard was practically in possession of the facts, would operate as an affirmance of the contract. In this conclusion he is supported by the authorities, among which are: Leaming v. Wise, 73 Pa. 173; Morgan v. McKee, 77 Pa. 228; Howard v. Turner, 155 Pa. 349. But, as clearly shown by the master, there was not only unreasonable delay in even offering to rescind, but there was also a course of action showing positive affirmance or ratification of the contract.

In any view that can be reasonably taken of the case, it was rightly decided. We find nothing in the record that calls for extended comment.

Decree affirmed and appeal dismissed with costs to be paid by the plaintiffs.