NEWTON NAT. BANK et al. v. NEWBEGIN.

(Circuit Court of Appeals, Eighth Circuit. April 17, 1896.)

No. 712.

1. FRAUD—DILIGENCE--QUESTION FOR JURY.

While the N. Bank was in embarrassed circumstances, plaintiff was induced, by the fraudulent misrepresentations of its cashier, to subscribe, in May, 1890, for 62 shares of a proposed increase of its capital stock, and to pay in a large sum of money therefor. In the following November the bank failed, and plaintiff, who lived at a distance, in another state, receiving then his first intimation that anything was wrong, proceeded to make inquiries, and, as a result, instituted proceedings before the comptroller of the currency to have the stock standing in his name declared void, and himself not a stockholder. These proceedings failing, he took steps in May, 1891, to have a bill filed to rescind his subscription. At the request, however, of parties who were trying to reorganize the bank, he consented to withdraw such suit, and surrender his stock to be canceled, upon an express agreement that it should be without prejudice to his right to sue the bank for the fraud by which he had been induced to subscribe and pay his money therefor. Plaintiff did not participate in the reorganization, and consistently maintained that he was not a stockholder, and that the bank was liable to him for the money paid. Upon the reorganization the creditors of the bank accepted in settlement a payment in cash, and certain certificates of indebtedness. In November, 1891, plaintiff brought this action against the bank to recover the money paid by him, as a deposit. In December, 1892, the bank failed again. *Held,* that the questions whether the plaintiff exercised reasonable diligence in discovering the fraud, and in electing to cancel his subscription when he became aware of it, could not be decided as questions of law, but were properly submitted to the jury, whose finding that he did exercise such diligence was conclusive.

2. CORPORATIONS—SUBSCRIPTION TO STOCK—RESCINDING—INSOLVENCY.

*Held,* further, that, under the circumstances of the case, the occurrence of the insolvency of the bank before the commencement of plaintiff's action did not preclude him from rescinding his subscription and recovering back the money paid for his stock.

3. SAME.

It seems that when a subscription to the stock of a corporation is clearly shown to have been procured by fraud, and no long time has elapsed since the subscription, the subscriber has not actively participated in the management of the corporation, there has been no want of diligence in discovering the fraud or taking steps to rescind, and no considerable amount of corporate indebtedness has been incurred, since the subscription, which remains unpaid, the stockholder should be permitted to rescind his subscription as well after as before the corporation ceases to be a going concern.

In Error to the Circuit Court of the United States for the District of Kansas.

C. S. Bowman (Charles Bucher was with him on the brief), for plaintiffs in error.

S. R. Peters and Henry Newbegin (John C. Nicholson was with them on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This case was here at a former term, on a writ of error that was sued out by Henry Newbegin, the present defendant in error. Newbegin v. Bank, 27 U. S. App. 712, 14 C. C. A. 71, and 66 Fed. 701. After the reversal of the former judgment, it was tried a second time before a jury; and Newbegin, who was the plaintiff below, recovered a verdict and judgment. To reverse that judgment, the Newton National Bank of Newton, Kan., and John Watts, its receiver, who were the defendants below, have brought the case here by a second writ of error. In his complaint or petition, which was filed November 9, 1891, the plaintiff charged, in substance, that the defendant bank was indebted to him in the sum of $6,683.60 for money lent and advanced to it at its request, the same being a deposit made with said bank on May 26, 1890, which sum it had promised and agreed to repay to the plaintiff on demand; that a demand for the return of said money was made prior to November 1, 1891; and that the defendant bank had failed and refused to comply therewith. The defendant filed the following answer to said complaint:

"Now comes the defendant the Newton National Bank, * * * and, for its answer to the petition of the plaintiff, denies each and every allegation, matter, and thing therein contained. Said defendant, further answering, says that on or about May 26, 1890; said plaintiff did deposit $6,683.60 with said defendant for a special purpose, to wit, to purchase and pay for 62 shares of the capital stock of said bank, and that afterwards said sum of money so deposited as aforesaid was, at the special instance and direction of said plaintiff, and with his assent and approval, disposed of and appropriated by said defendant in payment for said 62 shares of the capital stock of the defendant bank. Wherefore said defendant prays for a judgment for costs."

To the foregoing answer the plaintiff replied, in substance, that about the month of May, 1890, the defendant bank, being then in embarrassed circumstances, invited subscriptions to a proposed increase of its capital stock from $100,000 to $200,000; that such subscriptions were invited for the fraudulent purpose of replacing a portion of the original capital of the bank that had become greatly impaired; that the plaintiff was a resident of the city of Defiance, state of Ohio; that he was induced to subscribe for 62 shares of said increased stock, and in payment therefor to deposit the sum of $6,-683.60 with the defendant bank, by means of certain false and fraudulent representations that were made to him by the cashier of said bank touching its financial condition and solvency. The representations so made were set forth in detail in the reply. The plaintiff averred that he made the deposit aforesaid on May 26, 1890; that

62 shares of stock in said bank were issued to him on July 22, 1890; that he did not discover the fraud that had been perpetrated until late in the fall or early winter of the year 1890, whereupon he demanded from the defendant bank a return of the money that had been deposited with it, which demand was refused; that he subsequently returned to said bank the certificates of stock that had been issued to him, indorsing thereon that they were "returned for cancellation"; that the defendant bank received and accepted said certificates; and that it thereby became estopped and precluded from asserting that the plaintiff had assented to the appropriation of said money so deposited in payment for stock, as was alleged in its answer. On these issues the case was tried to a jury, which returned a verdict in the plaintiff's favor for the full amount claimed in his petition.

The defendants below, who are the plaintiffs in error here, have conceded in this court that the plaintiff was induced by false and fraudulent representations to become a purchaser of 62 shares of stock in the defendant bank. No controversy, therefore, arises over that issue. The defendants contend, however, that the plaintiff cannot recover, and that the court should have directed a verdict in their favor on the following grounds: First, because the plaintiff was not diligent in discovering the fraud that had been practiced, and because he was not sufficiently prompt in rescinding his subscription after discovering the fraud; and, second, because the insolvency of the bank is a bar to a recovery for the fraud practiced upon the plaintiff in inducing him to become a subscriber for stock. These are the main propositions on which the defendants below appear to have relied to defeat a recovery, and they are the principal questions that have been discussed on the present appeal.

The first of these propositions, in our judgment, is untenable. The plaintiff had no reason to suppose that a fraud had been perpetrated until the bank failed, on November 25, 1890; and it is most likely, we think, that some time elapsed after the failure before he was fully advised of the financial condition of the bank in May, 1890, when he was induced to make his subscription. The plaintiff resided in Ohio, and much, if not all, of the information which he sought to obtain relative to the affairs of the bank in May, 1890, had to be acquired by correspondence. In the course of his inquiries relative to the condition of the bank, he learned for the first time that the stock certificates which he held had been issued before the corporation had acquired the requisite authority from the comptroller of the currency to increase its stock. This information led him to make a prolonged effort to obtain a decision from the comptroller of the currency to the effect that he was not a stockholder, and that the stock standing in his name was utterly void. After the comptroller had declined to thus decide, the plaintiff took immediate steps to bring a suit against the defendant bank for the purpose of rescinding his stock subscription on the ground of fraud, and for the purpose of recovering the amount of his deposit. A bill of that character was prepared in Ohio, and was sent to Kansas some time in May, 1891, to be there filed. Before it had been filed,

however, representations were made to the plaintiff by Messrs. Ives and Philbrick, who represented other stockholders of the bank, to the effect that his attitude with respect to the shares of stock then standing in his name upon the books of the bank was preventing a reorganization of the bank and a resumption of business. When such representations were made in behalf of the other shareholders, a scheme to reorganize the bank with a reduced capital of $100,000 was then well advanced, 'and was subsequently consummated. The bank resumed business on July 1, 1891, with a reduced capital of $100,000, but failed a second time on December 15, 1892. When the plaintiff was appealed to by other shareholders to take no action that would prevent a reorganization of the bank by them, he supposed that a suit had been commenced by his attorney in Kansas to cancel his subscription. He accordingly replied to Messrs. Ives and Philbrick as follows:

"Defiance, Ohio, May 29, 1891.

"Ives & Philbrick, Washington, D. C.: The 62 shares may be taken out of court on express condition that I am held free from all liability, and suit go on without prejudice to my recovery as a depositor against the bank, which shall appear in the suit instead of the receiver, if all cannot agree on other terms hereafter.                           Henry Newbegin."

Subsequently, on July 27, 1891, the plaintiff transmitted the certificates representing the 62 shares of stock now in question to the president of the defendant bank. The stock was so transmitted to the bank at its instance, to enable it to perfect the scheme of reorganization. It furthermore appears that the stock was delivered to the bank under an agreement that it should be accepted and canceled without prejudice to the plaintiff's right to maintain a suit against the bank on account of the alleged fraud whereby he had been induced to become a subscriber for the same. During the period which elapsed between the first failure of the bank and the commencement of this suit, in November, 1891, the plaintiff, on several occasions, notified the officers of the defendant bank that he was not a stockholder therein, that he declined to be treated as a stockholder, and that he should hold the bank responsible for the fraud that it had perpetrated in inducing him to become a subscriber to its stock. Moreover, the testimony shows that he took no part in the scheme to reorganize the bank, and that he notified those who solicited him to join in the reorganization, by paying an assessment on his stock, that he would waive none of his rights, that he would not pay the assessment, and that, for all purposes of reorganization, those concerned in the scheme must consider the shares of stock which stood in his name on the books as canceled. So far as the evidence before us discloses, the plaintiff consistently maintained that he was not a shareholder, and that the bank was liable to him for the amount of money which he had paid on account of his subscription. In view of the facts and circumstances to which we have thus briefly adverted, we think it clear that the questions whether the plaintiff exercised reasonable diligence in discovering the fraud, and in electing to cancel his subscription after he became aware that he had been defrauded, were properly submitted to the jury,

and that the verdict on these issues must be accepted as conclusive. Questions such as these are usually questions for the jury. Courts of law cannot undertake to decide them, as questions of law, when any doubt is raised by the testimony as to whether a person has exercised proper diligence. We think that the record now before us fails to show that any act was done or performed by the plaintiff, subsequent to the discovery of the fraud, which would have warranted the court in declaring, as a matter of law, that the plaintiff had elected to affirm his subscription; and we think it equally clear that the jury were entitled to determine whether the plaintiff was guilty of any want of diligence, either in discovering the fraud, or in notifying the defendant bank of his intention to rescind, or in bringing a suit for that purpose after the fraud was discovered.

A more important question, to be next considered, is whether the circuit court should have directed a verdict for the defendants on the ground that the insolvency of the defendant bank, occurring before the suit was filed, precluded the plaintiff from rescinding his stock subscription. It has become the settled rule in England, since the decision in Oakes v. Turquand. L. R. 2 H. L. 325, 344, that a suit to rescind a stock subscription on the ground of fraud cannot be maintained by a stockholder, no matter what diligence he may have shown, after proceedings have been taken to liquidate the affairs of the corporation on the ground of its insolvency, inasmuch as the rights of creditors of the corporation, both as against the corporation and those who are registered shareholders, then become superior to the rights of the defrauded shareholder. Stone v. Bank, 3 C. P. Div. 282, 307; Wright's Case, 7 Ch. App. 60; Kent v. Brickmaking Co., 3 Ch. App. 493; Thomp. Corp. §§ 1439, 1441; Cook, Stock & Stockh. § 163. In this country there are some cases in which a stockholder's right to rescind his subscription after the intervention of proceedings in bankruptcy, or after the insolvency of the corporation, has been denied; but, as Mr. Thompson well remarks in his Commentaries on the Law of Corporations (section 1449), it does not appear in any of the cases that the denial of the right to rescind was grounded exclusively on the fact that proceedings in bankruptcy had been instituted, or that the corporation had become insolvent. Farrar v. Walker, 3 Dill. 506, note, Fed. Cas. No. 4,679; Upton v. Tribilcock. 91 U. S. 45; Ogilvie v. Insurance Co., 22 How. 380, 391; Michener v. Payson, Fed. Cas. No. 9,525; Duffield v. Iron Works, 64 Mich. 293, 31 N. W. 310; Turner v. Insurance Co., 65 Ga. 649; Ruggles v. Brock, 6 Hun, 164; Hurd v. Kelly, 78 N. Y. 588; Howard v. Turner (Pa. Sup.) 26 Atl. 753. In all of these cases the evidence showed that there had either been some lack of diligence on the part of the stockholder in discovering the fraud of which he complained, or unreasonable delay in asserting his rights after the discovery of the fraud, or active participation in the management of the corporation, or that debts had been contracted by the corporation, subsequent to the subscription, which either gave to corporate creditors superior equitable rights, or estopped the shareholder, as against a corporate creditor, from asserting that he was not a shareholder. The question whether a stockholder

should be permitted to rescind his subscription, on the ground of fraud, after the insolvency of the company, is attended with much doubt and difficulty, because of the peculiar relation which a shareholder sustains to the creditors of the company. In the case of Upton v. Englehart, 3 Dill. 496, 505, Fed. Cas. No. 16,800, Judge Dillon, while discussing this subject, pointed out that the unbending English rule above referred to was influenced in a measure by the companies act (25 & 26 Vict. c. 89), which makes provision for a "register of stockholders," to which the public have access, and that, as no similar register of stockholders is ordinarily kept in the United States, the English decisions holding that the commencement of a proceeding to wind up a company is in itself a bar to a suit for rescission are not strictly applicable to the conditions which prevail here.    He concluded the discussion of the question as follows:

"I am inclined to the opinion that if a company has fraudulently misrepresented or concealed material facts, and thus drawn an innocent person into the purchase of stock,—he at the time being guilty of no want of reasonable caution and judgment, and afterwards being guilty of no laches in discovering the fraud,—and he thereupon, without delay, notifies the company that he repudiates the contract, and offers to rescind the purchase, these facts concurring, I am inclined to the opinion that the bankruptcy of the company, subsequently happening, will not enable the assignee to insist that the purchase of stock is binding upon him."

There are obvious reasons why a shareholder of a corporation should not be released from his subscription to its capital stock after the insolvency of the company, and particularly after a proceeding has been inaugurated to liquidate its affairs, unless the case is one in which the stockholder has exercised due diligence, and in which no facts exist upon which corporate creditors can reasonably predicate an estoppel.   When a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion.   If a considerable period of time has elapsed since the subscription was made; if the subscriber has actively participated in the management of the affairs of the corporation; if there has been any want of diligence on the part of the stockholder, either in discovering the alleged fraud, or in taking steps to rescind when the fraud was discovered; and, above all, if any considerable amount of corporate indebtedness has been created since the subscription was made, which is outstanding and unpaid,—in all of these cases the right to rescind should be denied, where the attempt is not made until the corporation becomes insolvent.   But if none of these conditions exist, and the proof of the alleged fraud is clear, we think that a stockholder should be permitted to rescind his subscription as well after as before the company ceases to be a going concern.   There is some force, doubtless, in the view which has sometimes been taken by eminent judges, that when a person has been inveigled into making a stock subscription by representations that were clearly false and fraudulent, he should be entitled to rescind his subscription, even after the insolvency of the company, under the same circumstances that would entitle him to rescind a contract of a different nature; that is to say,

by proof of due diligence in discovering the fraud, and of prompt action after it was discovered. Upton v. Tribilcock, 91 U. S. 55, 56; Duffield v. Iron Works (Mich.) 31 N. W. 310, 316. See, also, Improvement Co. v. Merrill, 2 U. S. App. 434, 2 C. C. A. 629, and 52 Fed. 77. The case in hand, however, does not require us to go to that length, even if we felt so disposed, as the facts are peculiar and exceptional. In the present instance the fraud of the defendant bank, whereby the plaintiff, Newbegin, was induced to become a subscriber to its increased stock, is conceded. He lived a long distance from where the bank was located, and took no part, after becoming a stockholder, in the management of its affairs. He remained utterly ignorant of the fraud that had been practiced until the defendant bank closed its doors for the first time, on November 25, 1890, whereupon he immediately repudiated his subscription, as having been induced by fraud, and gave notice to that effect both to the bank and to the other stockholders. As heretofore stated, he declined to join in the subsequent proceedings to reorganize the bank with a reduced capital, but, at the request of the other stockholders, surrendered his shares for cancellation, that they might be able to carry out the plan of reorganization; doing so, however, upon the distinct understanding that such action on his part should not prejudice his rights. Moreover, the testimony shows that the creditors of the bank, who were such on November 25, 1890, accepted from the reorganized bank, in settlement of their claims, 25 per cent. thereof, payable in cash on September 1, 1891, and certificates from the bank for the residue thereof, which certificates were made payable in equal installments in 6, 12, and 18 months from and after September 1, 1891. There is nothing in the present record to show that these certificates were not paid as they matured, prior to the second failure, on December 15, 1892; and, in any event, it appears that these certificates for the old indebtedness were voluntarily accepted by the creditors from the reorganized bank, with full knowledge of the attitude that the plaintiff had assumed and then occupied. We think, therefore, that the present record fails to disclose a state of facts or circumstances which is sufficient to bar the plaintiff's right to maintain an action for the rescission of his stock subscription. It must be borne in mind that the action was brought after the bank had been reorganized, and when it was doing business as a solvent and going concern. Besides, the only creditors of the bank who, in any aspect of the case, are entitled to raise the question now under consideration, are those creditors, if there are any, who were such when the bank first failed, on November 25, 1890; and those creditors, as it seems, voluntarily elected to take the obligations of the reorganized bank in payment of their respective demands, with full knowledge of the plaintiff's present claim, and with full knowledge of the fact that he would insist upon being treated as a depositor, rather than as a stockholder. By taking such action, we think that they have waived whatever right they may have had, when the bank first closed its doors, to insist that the plaintiff should be treated as a stockholder. It is furthermore

doubtful whether, under the pleadings as they appear to have been framed, the defendants below were in a position to assert as a defense to the action that the plaintiff was barred of his right to rescind his subscription by the insolvency of the defendant bank. No such defense was pleaded either by the bank or its receiver, nor were any facts pleaded with a view of creating an estoppel; and, in the absence of such pleas, it may be. questionable whether such defenses were open for consideration. But, be this as it may, we think, for the reasons heretofore stated, that the circuit court very properly declined to instruct the jury that the plaintiff could not recover because of the insolvency of the defendant bank.

It is further suggested in behalf of the plaintiffs in error that, even if it be conceded that the question whether the plaintiff had exercised proper diligence in bringing a suit to rescind his subscription was properly submitted to the jury, yet that the charge of the trial court touching the degree and kind of diligence that the plaintiff was bound to exercise when he discovered that he had been defrauded was indefinite and insufficient. With reference to this suggestion, it is only necessary to say that we have examined the charge of the trial court upon these points, and are satisfied that it was substantially correct, and that none of the exceptions taken thereto are of sufficient importance to justify a reversal of the case. The result is that the judgment of the circuit court must be, and it is hereby, affirmed.