WALLACE v. HOOD.

(Circuit Court, D. Kansas, First Division. August 18, 1898.)

1. NATIONAL BANK—EFFECT OF PURCHASE AND RESALE OF ITS OWN STOCK.

The statutory inhibition against the purchase by a national bank of its own stock does not render stock so purchased void; and where, in such case, the stock is held for the bank by a nominal owner, a subsequent purchaser for value received by the bank acquires a good title, which cannot be questioned by the bank or its creditors.

2. SAME—LIABILITY OF STOCKHOLDERS—RESCISSION OF PURCHASE OF STOCK AFTER INSOLVENCY.

Though a person may have been induced by fraudulent representations to purchase stock of a national bank, the contract is voidable only at his option; and, where he has not discovered the fraud nor made his election at the time the bank passes into the hands of a receiver, he is apparently a stockholder, and can only escape liability as such by affirmatively alleging and proving the fraud, acts of diligence which negative any charge of negligence, and that no debt was created nor credit given the bank after he became such stockholder.

3. SAME—ACTION TO ENFORCE ASSESSMENT—DEFENSES.

A stockholder, by purchase in a national bank which has conducted business as such for six years, cannot defend against an assessment, on its insolvency, on the ground that the original capital stock was never paid in.

4. SAME—RESCISSION OF PURCHASE OF STOCK—TENDER.

One induced to purchase stock of a national bank by fraudulent representations of the bank, which was in fact the owner of the stock and received the price, cannot make an effectual tender of rescission which will support an action at law to recover the purchase price after the appointment of a receiver for the bank, as neither the bank nor the receiver then has authority to rescind and make restitution of the purchase money.

5. SAME—COUNTERCLAIM AGAINST RECEIVER.

In an action by the receiver of a national bank to enforce an assessment against a stockholder, the latter cannot maintain a cross petition in the nature of a counterclaim to recover the purchase price of his stock on the ground of the alleged fraud of the bank inducing its purchase by defendant. The proper proceeding in such case is by an independent bill in equity against both the receiver and the bank for a rescission, making tender of the stock.

This is an action by plaintiff, T. B. Wallace, receiver of the Missouri National Bank, at Kansas City, Mo., to recover of the defendant the sum of $10,000,—the amount of an assessment made upon him, as a shareholder in said bank, by the comptroller of the currency.

The defendant became the purchaser of said stock in April, 1896. On the 3d day of December, 1896, the bank was taken charge of by the comptroller of the currency, and plaintiff was appointed receiver thereof. On the 30th day of July, 1897, the comptroller of the currency made an assessment equal to the face value of the stock, as prescribed by sections 5151 and 5234 of the Revised Statutes, for the benefit of creditors of said bank. Due notice of this assessment was given to the defendant, and payment thereof was requested to be made on or before the 30th day of August, 1897. The defendant failing to comply therewith, this suit was instituted October 30, 1897. The defendant appeared, and has filed several amended and supplemental answers. His final substituted answer pleads in defense that he was deceived into the purchase of said stock by the false and fraudulent representations made to him by the president of the bank as to its financial condition and business. These misrepresentations are set out in great detail

in the answer. In explanation of the delay in interposing any objection to the defendant's relation as stockholder of the bank, and to avoid the implication of laches on his part, the answer pleads, in substance, that, notwithstanding diligence and every reasonable effort on the part of the defendant to discover the exact condition of the affairs of the bank, he failed to do so, up to the time of the appointment of the receiver, because of the artful concealments of the facts from him by the officers of the bank, and the artful manner in which the books of the bank were kept, and that after appointment the receiver persistently refused to allow him reasonable access to the books of the bank for examination and discovery of its true condition, and that he was postponed in his efforts by repeated assurances of the receiver that the assets of the bank were sufficiently ample to satisfy all of its debts and liabilities without recourse to an assessment upon the stockholders; that after the assessment made by the comptroller of the currency he obtained an order and permission from said comptroller about the 1st of September, 1897, to make such examination of the books of the bank as he desired, and that he did not fully discover the true facts of the case until the latter part of October, 1897, and on the 27th day thereof he made tender of the certificate of stock to the receiver, and demanded of him the return of the purchase money, which was declined; that no officer of the said bank to whom such tender could be made could be found, for the reason that said officers had left the state. The answer further pleaded that the stock in question had once been sold, and certificates issued therefor to the purchasers, and that, the financial condition of the bank becoming embarrassed, in order to prevent the holders of said certificates from putting them on the market and thereby discrediting the bank, the managing officers thereof had the employés of the bank purchase said stock from said holders, and take transfers thereof in the name of such employés, who were wholly insolvent,—the bank furnishing the money for such purchase,—and that said employés so held the same in fact and law for the use and benefit of the bank, as the real owner; that, when the defendant was induced to take said stock, it was accomplished by said employés surrendering said certificates for cancellation, and certificates were then issued by the bank to the defendant, the defendant being ignorant of said arrangement and scheme. It is finally alleged as matter of defense that no part of the original or reduced capital stock of the bank was ever actually paid for, as required by the banking laws of the United States, and that said capital stock had in many instances been issued to irresponsible parties, and worthless notes taken therefor. The defendant also presents with his answer what is called a "cross petition," in the nature of a counterclaim, for the recovery back of the amount of the purchase money paid the bank for said stock. The plaintiff has filed motions to strike out the answer and cross petition, and also demurrers thereto. After oral argument by the respective counsel, and amendments to the answer, the motions and demurrers have been submitted to the court on briefs.

William H. Wallace, Trimble & Braley, and W. C. Cochran, for plaintiff.

Eugene Hagan, C. N. Sterry, and I. E. Lambert, for defendant.

Before WILLIAMS and PHILIPS, District Judges.

PHILIPS, District Judge (after stating the facts). Deferring for later consideration the application of the motion and demurrer interposed to the last amended answer herein, a general discussion of the relation of the defendant to the creditors of the bank at the time of its declared insolvency and the appointment of a receiver will determine whether or not the matters pleaded in the answer constitute a good defense in law to the action brought by the receiver to recover the assessment made upon the defendant as a stockholder in the insolvent bank.

In respect of what may be termed the first defense, it is settled law that, notwithstanding the party may have been inveigled by fraudulent representations of the vendor into the purchase of shares of stock in an incorporated company, the contractual relation thus apparently established between him and the corporation and the other stockholders is not void, but only voidable at the election of the party defrauded. He may, notwithstanding the deception practiced upon him, prefer to stand by his bad bargain, and make the most of it. Therefore, the defendant not having discovered the alleged fraud nor having made his election to repudiate the contract at the date of the appointment of the receiver, both by the terms of his certificate and the stock book of the bank he was an apparent stockholder.

And, in respect of what is termed his second additional matter of defense, it is equally clear that he became and was at the time of the appointment of the receiver the legal and equitable owner of the 100 shares of stock purchased by him, both as against the bank and its creditors. When first issued, the stock in question was the authorized stock of the bank. It was not an overissue or an unauthorized issue, and therefore its issue was not ultra vires. In this respect the case is radically different from that class of cases cited by defendant's counsel where the bank had issued stock in excess of its authorized capital, or in the instance of stock purporting to be part of the increased capital, which had not been authorized by the approval of the comptroller of the currency. In such instances the act of the bank was clearly ultra vires. The stock so issued was void ab initio, as it never had any legal existence; and therefore, in contemplation of law, the purchaser of such stock acquired no property rights, nor privileges of a stockholder, and consequently did not become subject to the responsibilities and liabilities of a stockholder. Not so in respect of the purchaser of authorized valid stock. It must be conceded by the defendant that the first purchasers of the stock, when sold by the bank, became bona fide holders for value; and if, when they transferred their stock to the alleged dummy man of the bank, they did so in good faith, in ignorance of the alleged scheme of the bank, they were discharged from their liability as stockholders. And it is further to be conceded, under the allegations of the answer, that the transfer of stock to the employés of the bank as mere instruments of the bank—the bank in fact paying the consideration money for the transfer—rendered the bank the real purchaser. Under the statute the bank was not allowed to thus buy its stock, but this did not invalidate and make void the stock itself. The object and the policy of the statute in prohibiting a bank from purchasing outright its stock is to prevent the reduction of its outstanding stock, and the withdrawal pro tanto of its capital. Bank v. Lanier, 11 Wall. 374, 375. While the bank or receiver may go upon the vendor to recover back the purchase money in order to restore the capital, it must be the law that where a subsequent purchaser from the bank, like the defendant, acquires the stock through a simulated holder for the bank, in ignorance of the fact that the bank had employed its funds in placing the stock in the name of such simulated owner, the defendant paying therefor in good faith, his title to the stock is good against the bank and its creditors. The

purchase money paid by defendant went into the funds of the bank, whereby the equilibrium of the capital was restored; and no injury thereby was done to any stockholder, or to any creditor, or to the defendant. No one could complain, but the government, which might, if it deemed it politic, proceed as for a forfeiture of the charter of the bank. In Bank v. Stewart, 107 U. S. 676, 2 Sup. Ct. 778, Mr. Justice Field, in discussing section 5201, Rev. St. (National Banking Act), which prohibits a banking association from making a loan upon the security of shares of its own bank, said:

"It imposes no penalty, either upon the bank or the borrower, if a loan upon such security is made. If, therefore, the prohibition can be urged against the validity of the transaction by any one except the government, it can only be done before the contract is executed, while the security is still subsisting in the hands of the bank. It can then, if at all, be invoked to restrain or defeat the enforcement of the security. When the contract has been executed, security sold, and proceeds applied to the payment of a debt, the courts will not interfere in the matter. * * * Supposing it was unlawful for a bank to take those shares as security for a loan, it was not unlawful to authorize the bank to sell them when the contingency occurred. The shares being sold pursuant to the authority, the proceeds would be in the bank, as his property."

On principle, therefore, if it was unlawful for the bank to purchase, as alleged, the shares of stock in question, it certainly was not unlawful to sell them. Being sold, the proceeds went into the bank, restoring its capital, inuring to the benefit of its creditors. As said by Mr. Justice Swayne in Bank v. Matthews, 98 U. S. 626:

"The intent, not the letter, of the statute, constitutes the law. * * * Where a corporation is incompetent by its charter to take a title to real estate, a conveyance to it is not void, but only voidable, and the sovereign alone can object. It is valid until assailed in a direct proceeding instituted for that purpose. * * * So, an alien forbidden by the local law to acquire real estate may take and hold title until office found. We cannot believe it was meant that stockholders and depositors and other creditors should be punished, and the borrower rewarded, by giving success to the defense whenever the offensive fact shall occur. The impending danger of a judgment of ouster and dissolution was, we think, the check, and none other, contemplated by congress."

In legal effect, the attitude of the defendant is precisely like that of the purchaser of real estate from a corporation, the charter of which prohibits it from taking and holding real estate beyond certain specified quantities and for certain uses. The purchaser for value, in good faith, nevertheless acquires a good title as against the corporation, and its creditors cannot avoid payment of the purchase money. Railway Co. v. Proctor, 29 Vt. 93; Land v. Coffman, 50 Mo. 243–254. No authority has been cited, and, we take it, none can be found, sustaining the proposition that the defendant's purchase of stock under such circumstances was void. Certainly neither the bank nor the receiver has any ground of action against him for the cancellation of his certificate of stock. The bank obtained his money, which went to augment its assets for the benefit of both the stockholders and creditors. The defendant is not in the attitude of one who has sold stock outright to the bank, who thereby, as has been repeatedly held, becomes liable to an action for money had and received to the use of the bank, because in thus selling the stock to the bank he must take

notice of the law which inhibits the transaction. As such holder of stock in the bank the defendant secured to himself valuable privileges, among which was the right to participate in stockholders' meetings, to vote in the election of directors, to share in any dividends, and the right of visitation. And, although the defendant has concealed the fact in his answer, the truth doubtless is, as stated in the case of Same Receiver v. Bacon, 86 Fed. 553, he was elected and was an acting director of this bank during the time he was such stockholder. And, while the answer comments on the fact that the bank had from time to time paid to its shareholders unearned dividends, it is significantly silent as to whether or not the defendant was a recipient of such unearned favor. If he did receive such dividend, his alleged offer. of rescission was bad, without tendering it back. Kinne v. Webb, 49 Fed. 513, affirmed 4 C. C. A. 170, 54 Fed. 34. By operation of the statute, he became liable, as such stockholder, to the assessment ordered by the comptroller on the 30th day of July, 1897. This liability the courts have uniformly held is in the nature of a trust fund for the security and benefit of the creditors of the bank. Sawyer v. Hoag, 17 Wall. 620–622; Sheafe v. Larimer, 79 Fed. 924. The law presumes, without more, that credit is given to the bank on the faith of such liability of the stockholders. Upton v. Englehart, 3 Dill. 496–505, Fed. Cas. No. 16,800; Latimer v. Bard, 76 Fed. 586–540; Pauly v. Trust Co., 165 U. S. 606, 17 Sup. Ct. 465. In Tillinghast v. Bailey, 86 Fed. 48, the court says:

"Nor is it any answer to say that the plaintiff in the case does not show that any particular creditor relied on the increased stock and the payments made thereon by these defendants, and was deceived thereby. The public, in dealing with these banking associations, do not rely except upon public known facts in regard to the association, and the public are not supposed to be familiar with or rely on the facts of a particular case as between the shareholder and the bank. A rule which exacted any such condition as this would practically deprive innocent creditors of any remedy."

So Judge Dillon, in Upton v. Englehart, supra, says:

"If a person has accepted a certificate of stock, and becomes to all external appearances a stockholder, persons may have become creditors of the company on the faith of his membership, and in law are presumed to do so. And, as they cannot know the manner in which he was induced to become a stockholder, there is ground to maintain that as to them the manner is immaterial."

Since the ruling of the house of lords in Oakes v. Turquand, L. R. 2 H. L. 325–344, it has been the established doctrine of England that upon the declared bankruptcy of a corporation the implied trust in favor of the creditors on the double liability of stockholders becomes a fixed charge, so that after proceedings in bankruptcy are taken the stockholder is precluded from defending on the ground of fraud or deceit practiced upon him by the corporation whereby he was induced to become a stockholder. See Stone v. Bank, 3 C. P. Div. 282–307; Wright's Case, 7 Ch. App. 60; Kent v. Brickmaking Co., 3 Ch. App. 493. Judge Dillon, in Upton v. Englehart, supra, recognized both the reason and authority of the English rule, but conceded that it was measurably influenced by the company's act of 1862, providing for the register of stockholders. The case under consideration by Judge

Dillon' was that of stockholders of an Illinois insurance company; and, inasmuch as there was no similar provision in the Illinois statute to that of the English statute, he inclined to the opinion that if a company voluntarily misrepresented or concealed material facts, and thereby drew an innocent purchaser into the purchase of stock, and being himself guilty of no laches, and where there was no superior equity in favor of the creditors of the bank, an assignee under the bankrupt law might not be able to hold the purchaser of stock bound thereby. In Bank v. Newbegin, 40 U. S. App. 1, 20 C. C. A. 329, and 74 Fed. 135, the court seemed to apply the ruling of Judge Dillon in the discussion of the liability of a stockholder in a national bank, although the decision in the case did not turn or depend upon such construction of the national banking act. As applied to a stockholder in a national bank, the reason of the English rule is especially applicable, for by section 5210 of the national banking act it is expressly declared that:

"The president and cashier of every national banking association shall cause to be kept at all times a full and correct list of the names and residences of all shareholders in the association, and the number of shares held by each, in the office where its business is transacted. Such list shall be subject to the inspection of all the shareholders and creditors of the association, and all officers authorized to assess taxes under state authority, during business hours of each day in which business may be legally transacted. A copy of such list, on the first Monday of July in each year, verified by the oath of such president or cashier, shall be transmitted to the comptroller of the currency."

The presumption is always to be indulged that public officers perform the positive duty imposed upon them by statute, and therefore it must be assumed in this discussion that such a registry was kept by this bank, and that the defendant's name appeared therein as a shareholder. The supreme court, in Pauly v. Trust Co., supra, in discussing this provision of the statute, said:

"Manifestly, one—if not the principal—object of this requirement was to give the creditors of these associations, as well as state authorities, information as to the shareholders upon whom, if the association becomes insolvent, will rest the individual liability for its contracts, debts, and engagements."

And further on in the opinion, speaking of the liability of one who "holds himself out on the books of the association as true owner," the court said he—

"May be treated as the owner, and therefore liable to the assessment when the association becomes insolvent and goes into the hands of a receiver. * * * This is upon the ground that, by allowing his name to appear upon the stock list as owner, he represents that he is such owner; and he will not be permitted, after the bank fails, and when an assessment has been made, to assume any other position, as against the creditors. If, as between the creditors and the person assessed, the latter is not bound by that representation, the list of shareholders required to be kept for the inspection of creditors and others would lose most of its value."

It may be conceded to the defendant's contention that on some of the circuits it has been ruled that after the appointment of a receiver the defrauded stockholder may be allowed to have his contract as a certificate holder of shares of stock rescinded for fraud and deceit,

with the limitation that he has been guilty of no laches, and the like; but the right of rescission must, ex æquo et bono, be limited to the instance where the stockholder's equity is superior to that of the creditor, of the bank, as where no debts were created by and no credit was given to the bank after the acquisition of the shares by the shareholder. This was the case in Bank v. Newbegin, supra. Judge Thayer, in that case, expressly held that:

"If a considerable period of time has elapsed since the subscription was made; if the subscriber has actively participated in the management of the affairs of the corporation; if there has been any want of diligence on the part of the stockholder, either in discovering the alleged fraud, or in taking steps to rescind when the fraud was discovered; and, above all, if any considerable amount of corporate indebtedness has been created since the subscription was made, which is outstanding and unpaid,—in all of these cases the right to rescind should be denied where attempt is not made until the corporation becomes insolvent."

And it was because, as shown further on in the opinion, it affirmatively appeared that "the only creditors of the bank, who in any aspect of the case are entitled to raise the question now under consideration, are those creditors, if there are any, who were such when the bank first failed, and those creditors, as it seems, voluntarily elected to take the obligations of the reorganized bank in payment of their respective demands, with full knowledge of the plaintiff's present claim, and with full knowledge of the fact that he would insist upon being treated as a depositor rather than as a stockholder," that the court held the creditors had "waived whatever right they may have had when the bank first closed its doors, and insisted that plaintiff should be treated as a stockholder."

In Stuffelbeam v. De Lashmutt, 83 Fed. 451, the court expressly recognized the rule to be that, if any creditor becomes such after the purchase of stock, the stockholder could not, as to him, escape his liability on the ground of any antecedent fraud practiced upon him by the bank. So, in Wallace v. Bacon, 86 Fed. 553, the court, in enumerating the defects of the defendant's plea, said it did not "contain a word concerning creditors of the bank existing at the time of its failure, and while the defendant was holder of 100 shares of the capital stock, in whose behalf and for whose protection the assessment in question was levied." While the case of Bank v. Mathews (recently decided in the Ninth circuit, No. 39) 56 U. S. App. 636, 29 C. C. A. 491, and 85 Fed. 934, presented more directly the attempt of a stockholder to escape from his subscription to the increased capital stock on account of irregularities leading up to its issue, the discussion clearly indicates the steadfast tendency of the judicial mind on the question at bar. Speaking of the contention of the stockholder that the shortness of time which elapsed after the date when the comptroller of the currency took possession of the books and assets of the bank as evidencing something wrong in its management, the court said that it was immaterial. "It is the principle involved that controls the decision. * * * The door of construction cannot be opened in the courts as to what particular period of time must elapse before the principle should be applied. Mathews, having been a subscriber and stockholder, accepting its profits and sharing in

its benefits, must be held legally bound to the consequences of his relation to the bank. He must perform the obligation which he voluntarily assumed. Having received the advantages of a stockholder in the days of the bank's prosperity, he cannot be permitted to avoid its responsibilities to its creditors in the day of its adversity." The following state courts are pronounced in holding that, after insolvency declared, this defense comes too late: In re Empire City Bank, 6 Abb. Prac. 385, 402; In re Reciprocity Bank, 22 N. Y. 117; Ruggles v. Brock, 6 Hun, 164; Hurd v. Kelly, 78 N. Y. 588, 597; Briggs v. Cornwell, 9 Daly, 436–438; Duffield v. Iron Works, 64 Mich. 293, 31 N. W. 310; Mor. Priv. Corp. (1st Ed.) § 595.

To escape the legal liability which the statute affixes to the apparent owner of stock at the time of the declared insolvency of the bank and the appointment of a receiver, the burden rests throughout on the stockholder to affirmatively allege and prove every essential fact entitling him to be discharged from his contract as against the just and equitable rights of the wronged creditors of the bank. He must establish the fact of fraud, he must show diligence in seeking relief from the vicious contract, he must disclose acts of diligence negativing any laches, and affirmatively allege and prove that no debt was created or credits given the bank after he became such stockholder; thereby negativing the conclusion, non constat, credits may have been given to the bank on the faith of the defendant being a stockholder. The presumption would naturally be that such a bank, up to the date it was closed, was doing the ordinary business of receiving deposits; and certainly it must have received deposits within the preceding eight months, during which the defendant was an apparent stockholder. And he being, as his answer discloses, a man of large means and influence, the law is, as it should be, that every person giving credit to the bank is presumed to have dealt with it on the faith of the defendant's unquestioned ability to respond to any assessment which might be ordered for the protection of creditors. Moreover, his answer discloses the fact that prior to becoming a stockholder the credit of the bank had become the subject of grave suspicion, inviting visitation by the comptroller of the currency, necessitating a reduction of its capital stock, and that this fact was made known to him; and it is inferable that it was among the objects of the bank's officers, in interesting him in the bank, to inspire public confidence in its solvency. To discharge himself as such stockholder from his executed contract of purchase of stock should, especially against any creditor who became such after defendant became a stockholder, demand the strictest compliance with the most exact rules of pleading on his part, while every reasonable intendment should be indulged in favor of the creditors of the bank, who are represented in this action by the receiver. The answer, in the particular above indicated, is insufficient.

The defendant makes the extraordinary allegation that no part of the original or reduced capital stock of the bank was ever paid for as required by law. Exactly how such fact, if it exists, is to exonerate the defendant from his liability as a stockholder to the creditors of the bank, is difficult to understand, when applied to the instance of a bank which up to the time of the appointment of the receiver had been

doing business as a national bank, under authority of the comptroller of the currency, for six years. The statute directs that persons uniting to form such an association shall, under their hands, make an organization certificate, specifically stating certain facts required by the statute which certificate shall be duly acknowledged and transmitted to the comptroller of the currency, who shall record and preserve the same. The national banking act (Rev. St. § 5136) provides that:

"Upon duly making and filing articles of association and an organization certificate, the association shall become as from the date of the execution of its organization certificate a body corporate, and as such, and in the name designated in the organization certificate, it shall have power" to do the specified acts of a national bank.

### Section 5139 provides that:

"The capital stock of each association shall be divided into shares of one hundred dollars each, and be deemed personal property, and transferable on the books of the association in such manner as may be prescribed in the by-laws or articles of association. Every person becoming a shareholder by such transfer shall in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares; and no change shall be made in the articles of association by which the rights, remedies or security of the existing creditors of the association shall be impaired."

### Section 5140 declares that:

"At least fifty per centum of the capital stock of every association shall be paid in before it shall be authorized to commence business; and the remainder of the capital stock of such association shall be paid in installments of at least ten per centum each on the whole amount of the capital as frequently as one installment at the end of each succeeding month from the time it shall be authorized by the comptroller of the currency to commence business; and the payment of each installment shall be certified to the comptroller, under oath, by the president or cashier of the association."

From these provisions of the statute it is clear that from the time the comptroller of the currency issues the certificate to the bank, certifying to its constitution, it becomes a body corporate, endowed with the powers of a banking institution; and its shares of capital stock then become subject to sale, the purchasers of which thereby become shareholders of the bank. It is furthermore to be observed that the payment of the 50 per centum of the capital stock is an act subsequent to the organization of the bank, and it was a duty devolving upon the subscribers to the capital stock to authorize the commencement of business. It would, we take it, not be claimed that a purchaser of stock from the bank after its organization would not acquire a title thereto, notwithstanding the fact that the original subscribers may not have paid in 50 per centum of their subscription. And most certainly the directors of the bank could compel the payment of said 50 per centum of the capital stock against the subscribers; and any subsequent purchaser of stock from the bank, on failure of the directors to take the necessary action to enforce the payment of said stock, could protect himself against the dereliction of duty. And still more certainly a creditor of the bank, dealing with it upon the assumption that the capital stock had been paid in, upon failure of the directors to enforce payment of the original subscription would have a remedy to enforce the payment of this sum as security for his debt. In Sanger v. Upton, 91 U. S. 60, the court said:

"The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is a substitution for the personal liability which subsists in private co-partnerships. When debts are incurred, a contract arises with the creditors that it shall not be withdrawn or applied otherwise than upon their demands until such demands are satisfied. The creditors have a lien upon it in equity. If diverted, they may follow it as far as it can be traced, and subject it to the payment of their claim, except as to holders who have taken it bona fide for a valuable consideration and without notice. It is publicly pledged to those who deal with the corporation for their security. Unpaid stock is as much a part of this pledge, and as much a part of the assets of the company, as the cash which has been paid in upon it. Creditors have the same right to look to it as to anything else, and the same right to insist upon its payment as upon the payment of any other debt due to the company. As regards creditors, there is no distinction between such demand and any other asset which may become a part of the property and effects of the corporation."

But whatever may be the consequences of such a banking institution proceeding to do business without the payment of the 50 per centum of stock, as to third parties dealing with the bank after it has received its certificate of organization, whereby it becomes a body politic, endowed with the attributes of a banking institution, the principle of law announced in Louisville Trust Company v. Louisville, N. A. & C. R. Co., 22 C. C. A. 378, 75 Fed. 433, 457, and 43 U. S. App. 551, applies:

"Where a corporation does an act which has the appearance of one within its charter powers, the public, without notice to the contrary, in dealing with the corporation has the right conclusively to presume that the act is valid, and to proceed on that presumption."

Indeed, it would be a monstrous doctrine that after a banking corporation has received its certificate of incorporation from the authorized department of government, and has exercised the functions and privileges of a banking institution for six years, receiving deposits upon the assumption, which the depositors were warranted in making, that the original subscribers of stock had performed the act which entitled them to do a banking business, and upon the faith of the liability of each subsequent subscriber to its capital stock, when the creditors come for their money to be answered by the holders of its stock by saying, "The original subscription has not been paid." Such a proposition was refuted in no unmistakable terms by the supreme court, in Casey v. Galli, 94 U. S. 673, 680, in the following language:

"Where a shareholder of a corporation is called upon to respond to a liability as such, and where a party has contracted with a corporation and is sued upon the contract, neither is permitted to deny the existence or the legal validity of such corporation. To hold otherwise would be contrary to the plainest principles of reason and of good faith, and involve a mockery of justice. Parties must take the consequences of the position they assume. They are estopped to deny the reality of a state of things which they have made appear to exist, and upon which others have been led to rely. Sound ethics require that the apparent, in its effects and consequences, should be as if it were real, and the law properly so regards it."

It was upon the recognized doctrine that the certificate of organization granted by the comptroller of the currency, authorizing the bank to proceed, could not be questioned in a collateral proceeding as to whether all the acts required by the statute had been done essential to its creation and right to transact business, that the court, in Tilling-

hast v. Bailey, 86 Fed. 46, drew the conclusion, by analogy, that the certificate of the comptroller of the currency approving an increase of the capital stock of a national bank is conclusive of the existence of the facts authorizing the certificate, precluding a subscriber to the stock from questioning its validity when called upon by the receiver. to respond to his liability as a stockholder; citing Kennedy v. Gibson, 8 Wall. 498; Casey v. Galli, supra; Bushnell v. Leland, 164 U. S. 685, 17 Sup. Ct. 209; Latimer v. Bard, 76 Fed. 536; and Sanger v. Upton, 91 U. S. 64, in which last case the court, inter alia, said:

"Where there are defects in the organization of a corporation which might be fatal upon the writ of quo warranto, a stockholder who has participated in its acts as a corporation de facto is estopped to deny its rightful existence."

Without further discussion, the ruling in Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, precludes the making of this particular defense. In that case the charter of a corporation empowered it to increase its capital stock to a fixed amount. The statute of Kentucky in question contained this express provision:

"The corporation may commence business as soon as the articles are filed for record in the office of the county court clerk, and its acts shall be valid if publication in a newspaper is made and the copy filed in the office of the secretary of state, when such filing is necessary, within three months from such filing in the clerk's office. No change in any of the foregoing particulars shall be valid unless recorded and published as the original articles are required to be; nor shall any change be made at any time or in any manner which would be inconsistent with the provisions of this act."

When the subscriber to the increased capital stock was sued on behalf of the creditors of the insolvent corporation, the defense was interposed that this statute had not in fact been complied with by the incorporators; and the defendant there, as here, attempted to appropriate to himself the ruling in Scovill v. Thayer, 105 U. S. 143, where it was ruled that stock issued, representing an increase of the capital stock, which was unauthorized by law, was void ab initio, and that a subscriber thereto was not, therefore, estopped from pleading the unauthorized act; but the court distinguished the two cases upon the ground that where the—

"Abstract power did exist, and there was a way in which the increase could lawfully be made, and the creditors acted without fault, believing that the increase had been lawfully effected and the necessary steps had been taken, the doctrine of estoppel may apply, and the increased stock be deemed valid as against creditors who have acted upon the faith of such increase."

It is true that the statute of Kentucky in that case contained the provision, in effect, that the persons acting as the corporation under the provisions of the act should not be permitted to set up or rely upon the want of legal organization as a defense to an action brought against them as the corporation, nor should any person who might be sued on a contract made with such corporation, etc., be permitted to rely upon such want of legal organization in his defense; but the court held that this statute was nothing more than an affirmation of the rule established in Sawyer v. Hoag, 17 Wall. 610, ever since which, says the court—

"It has been the settled doctrine that capital stock of an insolvent corporation is a trust fund for the payment of its debts; that the law implies a promise by the original subscribers of stock, who did not pay for it in money or other property, to pay for the same when called upon by the creditors; and that a contract between themselves and the corporation that the stock shall be treated as fully paid and nonassessable, or otherwise limiting their liability therefor, is void as against creditors. The decisions of this court upon this subject have been frequent and uniform, and no relaxation of the general principle has been admitted."

Further on the court say:

"While an agreement that the subscribers or holders of stock shall never be called upon to pay for the same may be good as against the corporation itself, it has uniformly been held by this court not to be binding on its creditors."

The cross petition in this case is, in effect, a counterclaim to recover against the receiver the purchase money paid by defendant to the bank for the shares of stock in question. On reason and authority, this cross action cannot be maintained. This question is so satisfactorily discussed in Sheafe v. Larimer, 79 Fed. 921, as to render it but a work of supererogation to attempt to add much thereto; and we will only discuss the matter as it presents another interesting question of practice raised by the defense interposed in this case. The defrauded stockholder, like any other vendee, on discovering the cheat has open to him certain remedies, and none other. He may retain the thing purchased, and sue the vendor in an action for deceit, or he may tender back to the vendor the subject of the contract, and demand a rescission and restitution of the purchase money. In the latter case, after such tender, some courts hold that he may sue at law for the recovery of the purchase money. This course should have been taken against the bank; and, after judgment obtained, it would have been presented, like any other claim of a general creditor, to the receiver for allowance, and he could only receive thereon a pro rata share of the estate, according to the class to which such claim would be assigned by the comptroller of the currency. Such action should be brought against the bank, as it is the bank's act and wrong, and not that of the receiver, that is to be investigated, and which gives the cause of action. For such purpose the bank, notwithstanding the appointment of the receiver, is a continuing corporation. Its legal entity is in no wise affected by the mere appointment of a receiver. The corporation still retains its power to sue and be sued, to plead and be impleaded. Bank of Bethel v. Pahquioque Bank, 14 Wall. 399. The receiver is the mere ministerial agent and instrument of the comptroller of the currency for winding up the affairs of the bank, with only limited powers, specified by statute creating his office. He has no power even to compromise a debt or claim of the bank without the consent of the comptroller of the currency and the order of court. Consequently the tender and offer to rescind, and demand made upon the receiver, alleged in the answer to have been made by the defendant, were ineffectual, because the receiver was powerless either to accept or make restitution. An effectual tender necessarily carries with it the implication that the party to whom it is made has power to accept and comply. The answer pleads as an excuse for not making the tender to the bank that no officer of the bank could be found for such purpose.

Even had a tender been made to the bank after the appointment of the receiver, it would have been ineffectual. By operation of law the receiver, on his appointment, became entitled to the assets of the bank for administration; and no contract, adjustment, or undertaking of the officers of the bank could thereafter in any wise bind or conclude the statutory trustee, who holds for the benefit of creditors. Therefore the bank could not have consented to a rescission, nor could it make restitution of the purchase money, as the assets of the bank then belonged to the receiver. Consequently the legal fact remains that no tender was made, no rescission effected, prior to action at law to enforce payment of the contract liability against the stockholder. The answer does not ask for a rescission; neither could a rescission be adjudged in a law action. Sheafe v. Larimer, supra. The defendant could file an independent bill in equity against the receiver and the bank, and, according to respectable authorities, make tender of the certificate of stock, and pray for a rescission. This is the proper proceeding. If the fact be, as the answer alleges, that no substituted service could be had upon the bank, that of itself would present the occasion for a resort to a court of equity, which, to prevent a failure of justice, could proceed without the presence of the bank, though it is not to be conceded that the court could not find a way to bring the bank in, to say nothing of the fact that in open court, on the hearing of the demurrer and motion, counsel for the receiver, one of whom is the accredited legal representative of the comptroller of the currency, offered, if the defendant would file such bill in equity, to enter the appearance of the bank and the receiver, and to consent to a restraining order postponing the further prosecution of this law action until the determination of the equity suit. This case therefore is in this attitude: The defendant has neither sued the wrongdoer at law for damages consequent upon the alleged deceit, nor has he, before suit brought on this contract, offered to rescind; but after insolvency declared against the bank, and the appointment of the receiver, and the assessment made upon him by the comptroller of the currency, and after demand made upon him to pay over the trust fund in his hand for the benefit of creditors, he undertakes to entirely defeat the action at law by the receiver on the ground that he was defrauded by the misrepresentations of the bank's officers, in being led into the contract. Conceding that, in an ordinary action by the assignee of an insolvent corporation to recover an assessment against a stockholder, the defendant may plead the vitiating fraud on the ground of failure of consideration, yet, as applied to such action by a receiver under the national banking law, who sues, under authority of the statute, to enforce against the apparent stockholder the collection of the trust fund in his hands for the benefit of creditors, most certainly he can only have a standing in court to defend himself by affirmatively disclosing in his answer such a state of facts as would make it apparent that the equity of the creditors is inferior to that of the defrauded stockholder. It sounds somewhat strange to speak of a comparison and adjustment of the priorities of equitable rights in an action at law triable to a jury; nevertheless even in this form of action the law is still in the keeping of the court.

Treating the demurrers as in effect presenting the question of the sufficiency of the answer as a defense, and the sufficiency of the allegations of the cross petition to constitute a cause of action in favor of the defendant against the receiver, the same are sustained, and the motions therefore may be ignored.