### In re MORRIS BROS., Inc.

#### (District Court, D. Oregon. July 3, 1922.)

#### No. B–5653.

1. **Bankruptcy** &#8258;140(3)—**To establish trust fund must be traced.**

   One who paid money to bankrupt corporation, which went into its general funds and was used in its business, cannot establish a trust which entitles him to preference over general creditors.

2. **Bankruptcy** &#8258;345—**Claim of stockholder of bankrupt corporation, on rescission of his purchase of stock for fraud, held subordinate to claims of general creditors.**

   A stockholder of bankrupt corporation, who was induced to purchase his stock by fraud and misrepresentation, but who had held the same for 1½ years, during which time most of the existing indebtedness was created, *held* entitled to rescind his purchase, but his claim against the estate *held* subordinate to those of general creditors.

In Bankruptcy. In the matter of Morris Bros., Inc., bankrupt. On petition of Albert C. Smith for allowance of preferred claim. Claim allowed, but subordinate to those of general creditors.

This cause comes here on review from the referee in bankruptcy. His finding and decree were against the petitioner, who seeks to have his claim against the bankrupt's estate adjudged to be entitled to the status of a preferred claim.

For some two years prior to the transaction with which we are immediately concerned, Albert C. Smith, the petitioner, had been doing business with Morris Bros., Inc., in buying and dealing in bonds. In the latter part of July, 1919, a salesman of Morris Bros. approached Smith and induced him to turn over

&#8258;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to Morris Bros. the proceeds from certain Canadian bonds then due, which he had on deposit with the company and desired it to collect, for $2,000, par value, of its preferred stock. In order to induce Smith to purchase the stock, the salesman represented to him that Morris Bros. was doing a wonderful business, that its capital stock was all paid for, and that the preferred stock would be a fine buy; also that the stock would bear 6 per cent. interest, plus a division of the dividends after the common stock was paid off; that $500,000 of common stock was paid up, and that a like amount of the preferred stock would be issued.

On July 31, 1919, Smith accepted an interim certificate, whereby Morris Bros. agreed to deliver to him $2,000 of preferred stock of the company. This was carried until January 13, 1920, when Morris Bros. delivered to Smith, and Smith accepted, in lieu of the interim certificate, a certificate purporting to represent 20 shares of preferred stock. At the time this stock was delivered Morris Bros. paid Smith $66.67, being the interest on the stock to January 1, 1920, plus 1 per cent., and, by admission in the petition, petitioner received an additional sum, which, together with the $66.67, aggregated $146.67, covering interest on the stock at 8 per cent. from July 31, 1919, to the 1st day of July, 1920. Smith was the holder of the stock when Morris Bros. failed, which was about the end of 1920.

At the time Smith purchased the supposed preferred stock and the interim certificate, Morris Bros., Inc., was an incorporated entity, with an authorized capital stock of $100,000, and no more. This was common stock. The corporation was wholly unauthorized to issue preferred stock of any kind. On September 6, 1919, at a special meeting of the stockholders and by a resolution thereby adopted, the corporation was declared to be dissolved, and the directors were authorized and empowered to sell its business to a new corporation, bearing the same name, for the sum of $1,000,000. Steps were thereupon taken for the organization of the new corporation. Articles of incorporation were executed and filed, fixing the amount of capital stock at $1,000,000, consisting of 5,000 shares of common and 5,000 shares of preferred; the latter to be without voice in the management of the concern. Stock books were opened and subscriptions were made, as follows: S. M. Etheridge, common stock, 4,998 shares; preferred, 5,000 shares; amount, $999,800; Forbes B. Pratt, common stock, 1 share, amount $100; and John L. Etheridge, common stock 1 share amount $100.

Directors were elected and by-laws adopted. Among other things sought to be accomplished was a transfer of the assets of the old corporation to the new at a valuation of $1,000,000; the new corporation assuming and obligating itself to pay the debts and obligations of the old. The books of the new company do not appear to have been written up until January 1, 1920. By a report of Morris Bros., Inc., made to the corporation commissioner at Salem, Or., June 30, 1920, the capital stock thereof is represented to be $1,000,000, divided into 10,000 shares, at $100 per share all issued and paid up. Presumably the stock was paid up by balancing the assets of the old company against it.

In an account with Stella M. Etheridge it appears that she is credited with certain preferred stock, ranging in amount around $102,200, and is charged with an equal amount of bonds to offset the credit. Attempt has been made to trace the specific bonds charged to her, which are represented by sales slips indicating purchases by her from the company. She is also credited with certain bonds which would indicate a purchase by the company from her. After the failure of the concern, $75,000 of these bonds were found in Tacoma, Wash., but were returned to the trustee, and something like $25,000, found in the possession of the company itself, were turned over to the trustee. At the time of the failure, there were outstanding $64,500 in amount of the preferred stock among different persons who had purchased from the company. This includes Smith's stock.

On February 21, 1919, Morris Bros., Inc., acting through John L. Etheridge, president, drew a check on the United States National Bank, payable to the bank, for $100,000. Thereupon the bank issued its cashier's check for a like amount, and this was in turn deposited with the Forest Grove National Bank to the account of Stella M. Etheridge, and was checked out soon thereafter;

$99,600 to Henrietta A. Morris and $400 to Fred S. Morris. There was also diverted to the personal account of Fred S. Morris a large amount of securities.

When Morris Bros. closed its doors, the claims of the general unsecured creditors aggregated in excess of $1,824,000, the greater portion of which claims was, says the accountant, "contracted naturally in the last three or four months of business, from the 1st of September, 1920, on."

I. N. Smith, John W. Reynolds, and L. A. McNary, all of Portland, Or., for petitioner.

J. P. Winter, of Portland, Or., for trustee.

WOLVERTON, District Judge (after stating the facts as above). Two questions are presented for consideration: First, whether petitioner's claim is to be preferred above those of the general creditors; and, second, whether his claim is to be regarded in the light of that of a general creditor, and is entitled to share equally with such creditors in the distribution of the assets of the estate.

The proceeds of the bonds, which were the consideration petitioner paid for the preferred stock, as Bosworth, the accountant, testified, went into the general funds of the corporation, and were used by it in the general operation of its business; that is to say, they were not segregated or set apart into a separate fund, but went into the common property of the concern, and were probably deposited with the United States National Bank, and used for buying bonds and stocks and in paying the wages of employés, rent, etc. In other words, such proceeds did not go into a separate trust fund. Petitioner has failed utterly to trace the proceeds arising from the collection of these Canadian bonds into any specific trust fund which he is now enabled to identify.

[1] The settled rule in this jurisdiction seems to be that claimant's right to establish his trust and recover his fund depends upon his ability to prove his property in its original or substituted form in the hands of the alleged trustee. Spokane County v. First Nat. Bank of Spokane, 68 Fed. 979, 982, 16 C. C. A. 81. This petitioner has been unable to do. All he can say is that the proceeds of his bonds have gone into the general business of Morris Bros., Inc. They have since probably been several times turned over. They have wholly and entirely lost their identity, either in the original or substituted character, and the claim is therefore not one that can or ought to be preferred above those of the general creditors. To a like purpose, see Schuyler v. Littlefield, Trustee of Brown & Co., 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806, and In re See, 209 Fed. 172, 126 C. C. A. 120.

It is strenuously insisted, however, that the bonds that found their way into the hands of Stella M. Etheridge in exchange for certain of the preferred stock of Morris Bros., Inc., and which were eventually found in Tacoma and returned to the company, constitute a segregated fund, set apart and kept separate from the general property or assets of the company and that therefore petitioner is entitled to a lien upon this fund. This contention overlooks entirely the principle upon which such a lien is predicated. These bonds that came into the hands of Stella M. Etheridge are by no means the same bonds, money, or funds with which petitioner parted when he purchased the preferred stock.

They were supposedly other bonds that Morris Bros. purchased or accumulated after petitioner parted with his Canadian bonds, or money arising from the collection thereof, and were not that which constituted the consideration for the preferred stock that he acquired. It is not shown that petitioner ever owned or acquired any interest in the bonds that were sold or set apart to Stella M. Etheridge, and I am aware of no principle applicable whereby he is entitled to a lien upon any of these particular bonds. This disposes of the first contention.

Respecting the second question, it must be conceded that petitioner was induced to purchase his preferred stock through misrepresentation and fraud perpetrated by Morris Bros., Inc., its managers and agents. It is probable that the corporation was solvent immediately prior to February 21, 1919, the date when its assets were depleted by the withdrawal therefrom of $100,000 through the manipulation of its president and others concerned in the transaction. But the corporation was assuredly insolvent when petitioner purchased his preferred stock in July, 1919, and it henceforth remained insolvent until the organization of the new corporation. So was the new corporation insolvent during the entire time of its existence, or whatever existence it may be said to have had. The testimony of De Long, the agent of Morris Bros. who sold the stock to petitioner, and who was responsible for the misrepresentations made to him and upon which he relied in making his purchase, would seem to indicate that petitioner was advised that Morris Bros. was contemplating a reorganization of the corporation and an increase of its capital stock. Among other things, De Long testified:

"I approached him [petitioner] and told him that the company was reorganizing; that they were expanding and increasing their business, inasmuch as they expected to have additional capital. * * * I told him—I went into details with this preferred stock, told him there would be so much issued, and so on. * * * It was about the time I learned of the million dollar corporation, and I think that I told him about that. * * * At that time there had been something over $80,000 worth sold, maybe more.

"Q. Did you tell Mr. Smith that you had sold $80,000? A. Now, I must have told him. I would think that I did tell him. * * *

"Q. You told him they expected to sell about half a million dollars' worth of preferred stock? A. That was the issue."

There can scarcely be a doubt that Morris Bros. was depending upon a reorganization of the corporation for authority to sell preferred stock. It had no such authority under the original organization, and the fact of the issuance of the interim certificate is strongly evidentiary of its purpose to promote a reorganization with a view to acquiring authority to issue preferred stock. If the corporation had had the authority, it is likely it would have issued the stock at once.

It is immaterial whether the reorganization was regularly formed or not, or whether it was a strictly legal entity, authorized and empowered to issue the preferred stock or to transact the business which it represented it was to engage in. It is sufficient to know that it was the second entity that was thrown into bankruptcy, that it is that entity whose assets are being now administered in the court, and it is that entity from which petitioner is holding his preferred stock and against

282 F.—43

the assets of which he is prosecuting his claim. It would, therefore, be of little avail to attempt to discuss the legality of the second so-called corporate organization. It will scarcely be questioned that the new entity whether legally organized or not, is estopped to deny the legality of the issuance of petitioner's preferred stock. So, also, would it be estopped to deny its entity, if proceeded against as for money had and received, because of the acquirement of petitioner's funds through misrepresentation and deceit.

The regular procedure, however, by which to recover in such a case, as for money had and received, is by repudiation of the stock purchase, accompanied by notice of rescission and an offer to return whatever of value has been received by the purchaser, in order to place the corporation in statu quo. 14 C. J. 592. That has not been done in the case at bar. The petitioner has simply presented his claim against the estate, accompanied with a declaration of willingness on his part to do and perform whatever the court shall deem equitable in the matter of restoration of dividends paid on the stock and received by him. However as it is not apparent that petitioner had knowledge of the alleged fraud, or the insolvent condition of the corporation, prior to its · collapse, and as there has been interposed no technical insistence upon a strict compliance with the practice, the matter will be laid aside, and the cause determined upon its merits.

[2] The crucial question here presented is whether, under the facts as deducible from the evidence, the petitioner is entitled to have his claim adjudicated as one on a par with the general creditors. The rule that should govern in a case of this character has been clearly and concisely stated, together with elaboration of the reasons that induced its promulgation, in Newton Nat. Bank v. Newbegin, 74 Fed. 135, 140, 20 C. C. A. 339, 344 (33 L. R. A. 727), from which I quote:

"There are obvious reasons why a shareholder of a corporation should not be released from his subscription to its capital stock after the insolvency of the company, and particularly after a proceeding has been inaugurated to liquidate its affairs, unless the case is one in which the stockholder has exercised due diligence, and in which no facts exist upon which corporate creditors can reasonably predicate an estoppel. When a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the rôle of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion. If a considerable period of time has elapsed since the subscription was made; if the subscriber has actively participated in the management of the affairs of the corporation; if there has been any want of diligence on the part of the stockholder, either in discovering the alleged fraud, or in taking steps to rescind when the fraud was discovered; and, above all, if any considerable amount of corporate indebtedness has been created since the subscription was made, which is outstanding and unpaid—in all of these cases the right to rescind should be denied, where the attempt is not made until the corporation becomes insolvent. But if none of these conditions exist, and the proof of the alleged fraud is clear, we think that a stockholder should be permitted to rescind his subscription as well after as before the company ceases to be a going concern."

See, also, Wallace v. Bacon (C. C.) 86 Fed. 553, and Lantry v. Wallace, 97 Fed. 865, 38 C. C. A. 510.

Now, pursuing the thought as expressed by these authorities, and applying it here, it appears that practically a year and a half expired from

the time petitioner purchased his stock to the time the corporation failed—a considerable period. Presumably, petitioner dealt more or less with the corporation in the meanwhile. But, being misled and without knowledge of the fraud or the insolvent condition of the concern, this fact alone ought not to bar him from insisting upon his claim. Nor do I find want of diligence on petitioner's part, either in discovering the fraud or in taking steps to right the wrong, although it is probable that he was aware of the contemplated reorganization of the corporation in order to authorize issuance of preferred stock. It is, however, a fact satisfactorily proven that practically all the large indebtedness of the company now outstanding was created since petitioner obtained his interim certificate, and even since his certificate of stock was delivered to him and the interim surrendered. Under such conditions, and in pursuance of the rule, the general creditors have the superior equity.

The petitioner's claim will be allowed, but will be subordinated to the payment in full of the claims of the general creditors.